DueKee, Judge,
delivered the opinion of the court:
In this action, plaintiff seeks damages in the amount of $1,800,000 for losses alleged to have been sustained in consequence of breach of contract by defendant and defendant counterclaims for $976,000 damages alleged to have resulted from a breach of contract by the plaintiff.
During September 1950, Jess Larson, Administrator of the General Services Administration (GSA) created the Emergency Procurement Service (EPS) within GSA and delegated to it authority he had received from the Munitions Board to purchase, store, and dispose of critical and strategic materials for the national stockpile pursuant to the Strategic and Critical Materials Stockpiling Act of 1946, 60 Stat. 596, and the Defense Production Act of 1950, 64 Stat. 398.
After ascertaining that columbite ore was in short supply and being purchased for the national stockpile, Edward J. Willems, President of the plaintiff corporation, in a letter dated March 13, 1951, offered to sell to EPS approximately two million pounds of the ore from sources in British Guiana on terms specified therein. On March 29, 1951, a revised offer was submitted in which plaintiff stated that it was un *363 able to furnish a fixed delivery schedule, but that shipments would start within six months after the contract was awarded and that as development of the supplies progressed, plaintiff would furnish to EPS quarterly delivery schedules working under a five-year program to deliver a total of about two million pounds of the ore. In addition to such matters as price, specifications regarding the quality of the ore, etc., and a statement to the effect that the primitive conditions at the source of the ore would require considerable effort and expense for development, the revised offer contained the following paragraph:
Having the assurance and with the help of the United States Government, we are prepared to speed up, and step up, production as rapidly as conditions will permit, by installing whatever feasible equipment may be deemed necessary to achieve the most satisfactory end results.
By telegram dated April 13, 1951, H. C. Maull, Jr., of EPS, responded in language purporting to accept the offer (finding 7). The acceptance differed from the offer in several material respects, and was entirely silent regarding the matter of Government assistance.
On August 1, 1951, Willems wrote to Captain Maull of EPS informing him that the EPS acceptance deviated from the offer in several respects, and in particular, as follows:
(d) Our offer states clearly quote “Homing the assurance and with the help of the United States Government.” Your instrument neither gives assurance nor offers help.
On August 3,1951, Willems and a Mr. Wolfson, secretary of plaintiff corporation, conferred with EPS officials in Washington. After plaintiff’s representatives had complained of the divergencies between offer and acceptance, the parties entered into a detailed written contract, defining the full scope of their respective obligations and rights in connection with the transaction. The contract stated that the Government procurement was undertaken pursuant to the Strategic and Critical Materials Stockpiling Act of 1946. Prior to the signing of the contract, plaintiff’s representatives informed the EPS officials that plaintiff was a small company and would require financial aid from the Govern *364 ment to discharge its contractual obligations. The evidence also indicates that Captain Maull informed Messrs. Willems and Wolfson that EPS had no authority under the Strategic and Critical Materials Stockpiling Act of 1946 to make loans to assist EPS contractors, but that certain other government agencies were empowered to do so.
On August 23, 1951, EPS, acting pursuant to a term of the contract, established a letter of credit in the amount of $100,000 with a New York bank, which provided for sight drafts to be drawn by plaintiff as partial payment on the invoiced amounts of shipments of ore meeting specified standards.
From July 1951 on, plaintiff was in communication with the Economic Cooperation Administration (ECA) regarding a loan application for aid in securing equipment necessary for the development of the area in which the columbite ore was to be mined. Despite communications with several ECA officials, as of September 11,1951 no loan commitment had been made, although ECA was investigating the project and considering the application. Prior to this time plaintiff had also applied for a loan at the Export-Import Bank.
During that period, by Executive Order No. 10281,16 F.B.. 8789, dated August 28, 1951, the President established the Defense Materials Procurement Agency (DMPA). Executive Order No. 10281 (Finding 21) delegated to DMPA authority to purchase strategic minerals and materials and encourage their development, pursuant to the Defense Production Act of 1950. While EPS was thus relieved of its procurement responsibilities under the Defense Production Act, it retained those deriving from the Strategic and Critical Materials Stockpiling Act of 1946. Jess Larson was named Administrator of DMPA, and certain personnel from other agencies were transferred to DMPA. Among the latter was a Mr. McClintock, who became a regional specialist in the Foreign Expansion Division of DMPA, and who, while at ECA, had communicated with Willems regarding the loan.
After learning of the transfer of McClintock and certain ECA functions to DMPA, on December 11, 1951, Willems mailed an application for a loan of $153,720.00 for explora *365 tion of 12,000 acres of land in British Guiana, to DMPA, for the attention of McClintock. On December 12,1951, Charles E. Stott, Director of the Foreign Expansion Division, DMPA, replied to Willems’ letter advising him, inter alia, that the quality of engineering supervision and management to be employed on the project would exert strong influence upon DMPA’s consideration of the loan application and requesting further information in that context.
Later in December Willems met with Philip McKenna, President of Kennametal, Inc., a firm with considerable mining and metals experience which had utilized columbite in its manufacturing operations, and which was interested in acquiring columbite bearing properties. At the meeting discussion concerned the possibility of Kennametal joining with the plaintiff in the columbite venture in British Guiana.
On January 14 and 15, 1952, meetings ensued between representatives of Kennametal and the plaintiff and McClin-tock and Stott of DMPA concerning the loan application. Terms were discussed, and on January 15, 1952, McClintock suggested that Kennametal and plaintiff submit a new and complete application. McClintock advised the applicants that prior to any action on a contract, it would be necessary to obtain the approval of his division director, and to submit it to the Deputy Administrator, and finally to Jess Larson, the Administrator, for his signature and approval. That afternoon plaintiff and Kennametal drafted a memorandum agreement providing that Kennametal would advance certain monies to plaintiff and join in the venture to develop the columbite sources in British Guiana.
The completed loan application was submitted to Mc-Clintock on January 16,1952. As set out in the application, the loan was to be in the form of an advance against production. In a letter dated January 23,1952, McClintock advised plaintiff that the application had “been approved in principle” and that arrangements had been made for a conference to work out the details of a contract.
On February 15,1952, in response to a letter from a Ken-nametal official, McClintock noted that preparation of legal documents was not the sole impediment to the granting of *366 the loan. As an additional impediment he specified the EPS contract, specifically the delivery schedule — deliveries to begin within six months after execution of the August 3, 1951 contract, 400,000 pounds of ore to be delivered by June 30, 1953 — and pricing terms to which plaintiff had thereby obligated itself. He also noted that although preparation of a draft contract upon which finalization of the agreement in principle could be effected was proceeding, execution of a contract was a condition precedent to the earmarking of government funds for the project. There is evidence indicating that during previous meetings, DMPA officials had objected to the EPS contract and even demanded its cancellation by plaintiff as a condition precedent to the granting of a loan, on the grounds that plaintiff would be unable to meet the obligations undertaken by it in that contract as to price and delivery, and that DMPA wished to procure the columbite ore itself. There is also evidence indicating that Kennametal officials felt that plaintiff’s position under the EPS contract was disadvantageous. Nevertheless Willems refused to cancel the EPS contract unless the Government replaced it with one at least as advantageous.
Another conference occurred in the DMPA offices on March 7, 1952. McClintock presented a copy of a rough draft of a proposed loan agreement to representatives of plaintiff and Kennametal, who raised numerous objections to the terms. McClintock informed them that a new DMPA regulation to be released shortly provided a substantially higher schedule of prices than those specified in the EPS contract for ore of similar qualities. That afternoon Wil-lems and the Kennametal representative conferred with Mr. Kegan, a DMPA attorney, to analyze the proposed contract. They suggested numerous amendments and deletions to Kegan, who informed them that he lacked authority to agree to the suggested changes and that the requested deletions and amendments might have to be restored when the contract was executed.
On April 2, 1952, McClintock informed Kennametal that Willems was unacceptable to DMPA as head of the project.
A final conference ensued between the parties on April 15, 1952. At that time sharp disagreement arose between Wil- *367 lems and tbe DMPA officials, regarding among other matters, the cancellation of plaintiff’s EPS contract and Willems’ management of the project. The results of the conference were inconclusive.
On April 17, 1952, Kennametal withdrew from negotiations with plaintiff. Upon learning of this, DMPA officials treated the negotiations regarding the loan as terminated. They were never resumed. Thereafter plaintiff was apparently unable to pursue the project to maturity due to lack of capital.
By letters dated January 10 and April 7, 1952, the contracting officer of EPS requested that plaintiff supply statements showing the quantities of ore to be delivered during the first quarter of 1952, as required by the EPS contract.
On April 17, 1952, plaintiff replied by mail requesting extension of the original letter of credit to the end of 1952. On May 21, 1952, plaintiff wrote to EPS, stating that it aspired to attain weekly production of approximately 1,000 pounds of ore by August or September of 1952, and also that it hoped to obtain a Government loan for the purchase of equipment necessary to fulfill the EPS contract.
On May 28, 1952, plaintiff, in a letter, informed EPS that it contemplated shipping 25,000 to 30,000 pounds of ore by the end of 1952, but that this was largely contingent upon plaintiff’s ability to obtain the equipment necessary to accelerate production. Plaintiff again requested extension of the letter of credit. On the following day plaintiff, by mail, requested amendment of the contract to extend the original shipment date to the end of 1952.
On June 11, 1952, the contracting officer of EPS replied to plaintiff’s correspondence, requesting clarification of the discrepancies apparent in the previous communications regarding the amounts and dates of shipments specified, and the request for extension of the date for the original shipment beyond the end of 1952. The contracting officer also requested that plaintiff advise him concerning the necessity for extending the letter of credit through the latter half of 1952, when plaintiff contemplated no deliveries during that period.
*368 On February 5, 1953, EPS advised plaintiff by registered letter tbat unless deliveries commenced prior to February 15,1953, plaintiff’s right to proceed under the contract would be terminated. On February 17, 1953, EPS notified plaintiff that inasmuch as no deliveries had been tendered under the contract, EPS was terminating plaintiff’s right to proceed, pursuant to special article 15 (finding 57), without prejudice to any rights the Government might have in consequence of plaintiff’s breach of contract.
Plaintiff initially contends that a commitment to advance government loans must be inferred from its negotiations and contract with EPS, and that DMPA, which plaintiff asserts is for these purposes identical with EPS as an organ of GSA, in making the granting of a loan contingent upon cancellation of the EPS contract, effected an anticipatory breach of the EPS contract, excusing plaintiff’s performance, and entitling plaintiff to damages.
In asking us to infer from the EPS contract that defendant obligated itself to obtain a government loan for plaintiff, plaintiff stresses the statement in its revised offer of March 29, 1951 to the effect that “having the assurance and with the help of the United States” plaintiff would be able to accelerate production and deliveries. The most elementary principle of contract law requires that an offer, to form the basis of a binding agreement, must be sufficiently definite to enable a court to construe it with precision for purpose of enforcement. 1 Williston, Contracts §37 (3d ed. 1957). Not only is the statement upon which plaintiff relies in definite as to the amount of the loan allegedly sought, it is entirely ambiguous as to the type of assistance desired, financial or otherwise. Indeed there is provision in the August 3, 1951 contract, specifying that the Government would assist plaintiff by expediting delivery of machinery for which plaintiff had placed firm purchase orders. Furthermore, defendant’s telegraphic acceptance of the March 29, 1951 offer stated nothing whatever regarding financial aid, indicating at least that defendant expressed no intention to contract to secure financial assistance for plaintiff. Moreover, Willems’ letter of August 1, 1951 to the EPS officials indicated that plaintiff was aware of de *369 fendant’s failure to assume any obligation regarding a loan. In view of these circumstances, we must conclude that the evidence in the record concerning the period prior to the contract of August 3, 1951 does not support an inference to the effect that defendant had legally obligated itself regarding the financial assistance that plaintiff required to perform its contractual obligations.
The August 3, 1951 contract between EPS and plaintiff is a lengthy, integrated document dealing in detail with every aspect of the mutual obligations of the contracting parties. Consequently, it must be deemed conclusive as to the contractual arrangement extant between the parties, in derogation of any prior commitments the substance of which it embodies. Holmberg v. United States, 91 Ct. Cl. 501.
Moreover, the evidence indicates that on August 3, 1951, the date the contract was signed, EPS officials informed plaintiff that they were acting pursuant to the Strategic and Critical Materials Stockpiling Act of 1946, which conferred no authority to extend financial assistance. Since neither the offer and acceptance nor the August 3, 1951 contract obligated EPS to secure financial assistance for plaintiff, and since plaintiff was duly apprised of the lack of intention of the EPS officials to incur any such obligation, we must conclude that the procurement of a loan for plaintiff had never been a part of the obligations undertaken by EPS in its contractual arrangement with plaintiff. Consequently, failure by EPS to secure a loan for plaintiff could under no circumstances be deemed a breach of contract.
Plaintiff further asserts that DMPA’s refusal to extend a loan to plaintiff unless the EPS contract were canceled, effected an anticipatory breach of the EPS contract in two respects: first, DMPA failed to discharge the Government’s obligation under the EPS contract regarding plaintiff’s loan; and second, on the theory that a party to a contract is obligated to facilitate, if possible, performance by the other contracting party rather than impede it. Since we have already decided that EPS had never contracted to furnish plaintiff financial assistance, only the second theory requires further consideration.
*370 Plaintiff’s argument to the effect that DMPA breached the EPS contract by demanding its cancellation as a condition precedent to the granting of a loan, is necessarily bottomed on the concept that EPS and DMPA, as organs of GSA, were for the purposes of the contract and this proceeding identical. Only on this assumption can plaintiff construct an argument to the effect that DMPA’s actions constituted impediment of performance under the contract by a contracting party.
The EPS contract states on its face that EPS was acting in a procurement capacity under authority of the Strategic and Critical Materials Stockpiling Act of 1946'. DMPA was endowed with procurement authority deriving from the Defense Production Act of 1950 in addition to its delegated lending authority pursuant to Executive Order No. 10281. DMPA was empowered generally to lend money to encourage development of sources of strategic materials pursuant to the Defense Production Act. The exercise of DMPA’s delegated authority was entirely independent of EPS action and control, originating as it did in separate, independent legislation. Implicit in the delegation to DMPA of authority to make loans from a fund of money is the discretion to select as projects for investment those promising the most fruitful use of the available funds while insuring greatest protection of the capital invested. Consequently, it would seem perfectly reasonable for DMPA officials to refuse to lend money for plaintiff’s venture if they believed that the obligations which plaintiff had undertaken in the EPS contract were sufficiently disadvantageous to make fruition of the development project doubtful, thus jeopardizing the integrity of the funds loaned. In this context, we think it significant that plaintiff sought terms whereby repayment of the proposed loan would be required exclusively in the form of deliveries of ore, and that plaintiff and its co-venturer refused terms whereby they would have been bound to repay the loan in the event that exploration proved commercial development of the sources unfeasible and no deliveries were made. On the other hand, DMPA might well have demanded cancellation of the EPS contract as a condition precedent to the granting of the loan to the end that it might contract *371 with plaintiff to purchase the ore pursuant to its own procurement program, thereby placing control over the loan and procurement under the aegis of the same agency. The factor of prime importance is that EPS and DMPA were in fact separate entities, albeit both were within GSA, acting pursuant to different legislation towards objectives that were not necessarily either identical or reciprocal. EPS, under the Strategic and Critical Materials Stockpiling Act of 1946, was functioning solely in a procurement capacity when it contracted with plaintiff, and thus presumably would best serve the legislative purpose by purchasing the ore at the lowest price attainable under market conditions. DMPA, on the other hand, was concerned, pursuant to its statutory authority, with a broader program of encouraging development of strategic materials in short supply, as well as with procurement. As a lender, DMPA was genuinely interested in the security of funds invested in plaintiff’s project and consequently directly concerned with the possibility of the project failing due to the inability of plaintiff to perform under a disadvantageous contract with EPS. Moreover, DMPA, by virtue of its authority to encourage development of strategic materials in short supply might ultimately have paid higher prices for the ore than those specified in the EPS contract. On the basis of the record and the circumstances noted above, we conclude that the two agencies were not identical for the purposes of the transaction, and that DMPA’s actions did not constitute the actions of a party to the EPS contract. Consequently, we find that the DMPA demand for cancellation of the EPS contract as a condition precedent to the granting of the loan did not precipitate an anticipatory breach of the EPS contract by the Government. As noted earlier, DMPA was under no compulsion to advance the loan, and plaintiff was in no way proscribed from seeking the funds it required elsewhere.
Regarding the EPS contract, plaintiff alleges additionally that EPS committed a breach by failure to renew the letter of credit for the benefit of the plaintiff. We see no merit in this contention since the contract obligated EPS to maintain the letter of credit only as a medium for partial payment to plaintiff for shipments of ore actually made pursuant to the *372 contract. Maintenance of the letter of credit was not a condition precedent to plaintiff’s performance. Inasmuch as plaintiff never developed the lands on which it held mineral concessions sufficiently to achieve commercial production and thus never approached the position where it could deliver quantities as specified in the contract, failure of EPS to renew the letter of credit had no effect whatever on plaintiff’s ability to discharge its contractual obligations. On the contrary, the evidence supports the finding that at all times until February 15, 1953, EPS was ready and willing to discharge its obligations, but that plaintiff was patently unable to perform under the contract. Cancellation by EPS was entirely justified under the clause of the contract that accorded EPS the absolute right to terminate, notwithstanding any other term embodied therein, if by February 15, 1953 plaintiff had made no deliveries. While it is true that plaintiff supplied some samples of the ore for the Government’s analysis, the record discloses no shipments by plaintiff that in quantity or under any other criteria might, even under the most generous construction, be deemed deliveries pursuant to the contract.
Plaintiff attempts to rely on the force majeure clause of the contract, which would extend the dates for performance in the event of delays due to the occurrence of certain contingencies beyond plaintiff’s control. Plaintiff cites as the contingency invoking the force majeure clause the failure of DMPA to lend plaintiff the funds it required to perform its part of the contract. The cause of plaintiff’s inability to perform, rather than deriving from a contingency beyond plaintiff’s control, lay solely in the conspicuous undercapi-talization of the corporation with relation to the obligations it undertook under the EPS contract. As noted above, neither EPS nor DMPA was at any time obligated to advance funds to plaintiff, and plaintiff was not restricted to these agencies, or to the government, in its quest for the funds it required. Plainly, plaintiff’s undercapitalization is not such a circumstance beyond its control as to be within the purview of any force majeure clause.
Plaintiff asserts further that it suffered damages in consequence of a breach of contract to make a loan on the part *373 of DMPA. It is plaintiff’s position that by McClintock’s letter of January 23, 1952, DMPA contracted to issue the loan. The letter reads as follows:
Referring to your application in conjunction with Kennametal, Inc., for an advance against production pursuant to recommended development program in British Guiana has been approved in principle.
Arrangements have been made for a conference next Monday to work out the details of a contract.
Plaintiff contends that the words “approved in principle” in the letter effected an acceptance in fact of the loan application, thereby establishing a contract under which DMPA obligated itself to advance funds to plaintiff.
We must ascertain whether McClintock’s letter was sufficiently positive and unequivocal, so as to indicate intention to assent to the offer, and to create a contract. 1 Williston, Contracts § 72 (3d ed. 1957). We think it was not. While the words “approved in principle” bear the connotation of a vague sort of assent to the general idea of a plan or project, we believe they do not indicate unequivocal acceptance of a specific offer with intent to effect a contractual relation, even as the use of the word “approved” exclusively might be susceptible of such construction. The second sentence of the letter, proposing a date for a conference at which the details of the “contract” might be worked out, complements and confirms this construction. The expressed need to “work out the details of a contract” connotes clearly the fact that negotiations had not yet been concluded, and that the letter itself could not be construed as creating the contract. That McClintock did not intend the phrase “approved in principle” to create a contract is borne out by the facts attending the negotiations. DMPA procedure required that the regional specialist (McClintock) would review a proposed project with the loan applicants. If he deemed it meritorious and within a DMPA program, he would reach a tentative agreement with the applicants regarding the extent of the project and the manner of effectuation. This was termed as a phrase of art, an “agreement in principle.” The regional specialist would then prepare a summary of the project for the Director of the Foreign Expansion Division, with a recommendation that negotiations toward a *374 possible contract be continued. If approved by the Division Director, the specialist and the DMPA legal staff would attempt to work out the detailed contract with the applicant. When the parties agreed on the terms of a proposed contract, a draft thereof would be submitted to the Division Director for his approval, after which it would be sent to the Administrator for his signature (finding 32).
Although plaintiff might not have been fully apprised of this procedure, on January 15, 1952, only eight days prior to the date on his letter, McClintock informed the applicants that prior to the granting of any loan, a contract would have to be prepared which would meet the approval of the Division Director and be signed by the Administrator. Since plaintiff was to this extent aware of the procedure, and in view of McClintock’s allusion to the projected conference to “work out the details of a contract,” we conclude that plaintiff had no reasonable basis for construing McClintock’s letter of January 23d as an acceptance of its loan application establishing a binding contract between the parties.
Having concluded that defendant was not guilty of any breach of contract, let us now consider defendant’s counterclaim for damages based on plaintiff’s nonperformance under the EPS contract. The single reason for plaintiff’s failure to perform its obligations under that contract was its obvious undercapitalization. As noted earlier, plaintiff was aware of its lack of sufficient funds to perform when it committed itself under the EPS contract but proceeded regardless, on the assumption that it would be able to raise the capital, probably from the government. When the needed funds failed to materialize, due to no legal malfeasance by the Government, plaintiff could not develop its properties and thus could not make any deliveries under the contract. Plaintiff’s failure to perform, on the basis of the record, undoubtedly constituted a breach of contract. The Government was within its rights in terminating plaintiff’s right to perform by invoking the article of the contract providing precisely for such action in the event of plaintiff’s failure to make any deliveries prior to February 15, 1953, and which preserved whatever other rights might accrue to the Government in consequence of plaintiff’s failure under *375 the contract. Under the basic principles of contract law, plaintiff is liable to defendant for damages in an amount equal to the losses incurred as the natural and proximate consequence of plaintiff’s breach of contract.
In the present case defendant concedes that EPS did not replace the ore undelivered under the EPS contract, but argues that the Government suffered damages directly attributable to plaintiff’s breach in the amount of $976,000. While EPS did not replace the undelivered 2,400,000 pounds of ore, on May 28,1952 DMPA was authorized by an administrative order to procure fifteen million pounds of columbite ore by the end of 1956, at prices designated therein (finding 58) pursuant to which the Government calculates it would have had to pay $976,000 more for 2,400,000 pounds of ore of the quality to be delivered under the EPS contract than it would have paid had plaintiff discharged its obligations (finding 62). In view of the relatively short supply of columbite at the time, defendant argues vigorously that by virtue of the fact that the Government held itself out as ready to purchase fifteen million pounds of the ore at the higher prices, those prices became the market prices, and thus, since in the case of a breached sales contract the measure of damages is usually the difference between the market and contract prices, its loss should be placed at $976,000. At the end of 1956, DMPA had purchased the full fifteen million pounds authorized by the directive, at the higher prices set forth therein. Defendant contends that it is highly probable that had plaintiff delivered the 2,400,000 pounds of ore specified in the EPS contract, the fifteen million pounds authorized by the DMPA directive would probably have been reduced by an identical quantity. Defendant does not, however, offer any concrete support for this assumption.
Although defendant informs us in its brief that the “weight of authority” has “well established” the proposition that a buyer aggrieved by a seller’s breach of a sales contract need not repurchase the undelivered goods to recover damages measured by the difference between the market and contract prices, the sole supporting authority cited is United States v. U.S. Foreign Corporation, 151 F. Supp. 658 (S.D. N.Y.), wherein a moderated statement of the proposi *376 tion appears as the unsupported obiter dictwm of the district judge.
In the classic case of a vendor’s breach of a contract for the sale of goods, the vendee is often said to be entitled to damages equal to the difference between the contract price and the market price. In these cases, however, the proposition attains utility only because the aggrieved vendee has proven that it actually suffered losses in that amount as a natural and proximate result of the vendor’s breach. Often this is established by proving that the vendee went out on the open market following the vendor’s breach and replaced or sought to replace the undelivered goods. General propositions concerning the measure of damages are relevant to the particular controversy, however, only insofar as they reasonably represent the nature of the loss that the claimant can prove actually and proximately resulted from the vendor’s nonperformance. Stated another way, the measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract. Were this not true, the doctrine of mitigation of damages would lose much of its significance. The claimant bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation. Winn-Senter Construction Co. v. United States, 110 Ct. Cl. 34, 63.
In view of the circumstances attending this controversy, we do not believe that the Government has adequately discharged either of its burdens. Under the breached contract EPS was the signatory party. The Government has not attempted to show that EPS made efforts to replace the ore plaintiff failed to deliver, or even that it suffered loss in any way as a result of plaintiff’s breach. As a matter of fact, the sole support of the claim of loss set forth in the Government’s brief is the unsupported proposition that “it is reasonable to conclude that if delivery had been made under the EPS contract the requirements under the Defense Production Act of 1050 and Executive Order No. 10281 could have been re *377 duced to the extent that plaintiff had performed under the EPS contract.” No rationale is offered to provide any clue as to why this should be. In point of fact, EPS and DMPA undertook procurement pursuant to different delegations of statutory authority. The DMPA directive for the procurement of fifteen million pomids of columbite ore was issued in May 1952, at a time when EPS could reasonably have expected to receive delivery of the quantity under contract with plaintiff. Inasmuch as the DMPA directive, issued pursuant to the Defense Production Act of 1950, called for procurement of fifteen million pounds without reference to the quantity EPS had previously placed under contract pursuant to the Strategic and Critical Materials Stockpiling Act of 1946, it seems at least as reasonable to conclude that the DMPA purchases were to be in addition to those of EPS, and that had plaintiff delivered the ore under contract DMPA would have persisted in procuring the entire amount authorized, as it does to accept the Government’s assumption. The order authorizing DMPA’s procurement of the additional fifteen million pounds of columbite ore indicates on its face that it was designed to encourage expansion of production of the ore (finding 58), as distinguished from normal procurement on the open market, and bears the indisputable connotation that the higher prices specified therein were offered as an incentive to this end. In this context we find enlightening the testimony below to the effect that upon conclusion of the DMPA program the price of columbite ore fell drastically to levels below those specified in the EPS contract. The fact that DMPA did ultimately purchase the fifteen million pounds at the higher prices specified in the order has no proven relation to plaintiff’s breach of contract. Consequently, in view of defendant’s utter failure to establish any loss suffered by the Government as a result of plaintiff’s breach, we conclude that defendant has failed to discharge its burden of proving the fact of loss thus precluding recovery on its counterclaim.
For the reasons stated we hold that neither party is entitled to any recovery as a result of this proceeding. There *378 fore plaintiff’s petition and defendant’s counterclaim will be dismissed.
It is so ordered.
MaddeN, Judge (Bet.); Laramore, Judge\ Whitaker, Judge; and JoNes, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows :
1. The plaintiff is a corporation organized and existing under and by virtue of the laws of the State of New York.
2. On September 1, 1950, Jess Larson, the Administrator of General Services Administration (hereinafter called GSA), established within GSA a special branch designated as the Emergency Procurement Service (hereinafter called) EPS), and delegated to it the authority he had received from the Munitions Board to purchase, store, and dispose of strategic and critical materials pursuant to the Strategic and Critical Materials Stock Piling Act of 1946 (60 Stat. 596). At all times material to this action, A. J. Walsh was Commissioner of EPS, Captain Harry C. Maull, Jr., was the Director of the Purchase Division, and Leonard W. Mooney was a purchasing agent. In this position, Mr. Mooney received and evaluated proposals and made recommendations with regard to the awarding of contracts, but he had no contracting authority.
3. On February 7, 1951, at the request of Edward J. Willems, president of the plaintiff corporation, the Department of the Interior mailed him a reprint of the Minor Metals chapter of the Bureau of Mines 1949 Minerals Yearbook, which stated that columbite and tantalite were being acquired for the national stockpile.
4. Columbium (niobium) and tantalum are metals which are found and mined together from columbite and tantalite ores. The principal use for columbium is as a carbide stabilizer in stainless steels and for imparting superior creep resistance and fatigue strength to alloys employed in jet engine and gas turbine construction. Tantalum, which has properties of corrosion resistance that are almost the same as *379 glass, is extensively employed in surgical repairs and tantalum compounds are used as catalysts in optical glass components.
The Minor Metals chapter of the 1949 Minerals Yearbook stated that no data were available on the stocks of columbium or tantalum in any form, that the major share of United States imports of columbite came from Nigeria, and that the total receipts of this commodity from all countries had declined to the lowest point since 1941.
Sometime prior to August 3, 1951, the defendant held a confidential geological report and other information estimating the presence of vast quantities of columbite in British Guiana. The information available to defendant also showed that the lands on which the columbite might be found were heavily forested and that transportation was not available.
5. On February 13,1951, Mr. Willems, as president of the plaintiff corporation, wrote the EPS, stating that he had noted from the booklet received from the Department of the Interior that there was a shortage of columbite and tantalite and that these commodities were being acquired for the national stockpile. The letter stated that his company could supply such commodities and requested information as to the Government’s present and anticipated requirements, as well as information on current price ratios. Thereafter on March 8,1951, Mr. Willems conferred with L. W. Mooney of the EPS, who suggested that plaintiff submit a formal proposal for supplying the Government with columbite, meeting national stockpile specification P-15, dated May 17, 1950. A Munitions Board Procurement Directive of December 14,1950, called for the purchase of 26,000,000 pounds of columbite to be delivered by June 30,1958. As of April 11, 1951, 6,409,392 pounds had been purchased, leaving a balance of 19,590,608 pounds to be acquired.
6. Following the conference with Mr. Mooney and by letter of March 13, 1951, plaintiff submitted to the EPS a written proposal in which plaintiff offered to supply 2 million or more pounds of columbite over a 2-year period. The letter stated that plaintiff was unable to furnish any fixed delivery schedule and that it was faced with difficult problems of transportation in British Guiana, since there were no roads *380 and everything had to be transported by men carrying packs on their backs. The letter further stated as follows:
Having the assurance of the United States Government, we are prepared to speed up, and step up, production as rapidly as conditions will permit, by installing whatever feasible equipment may be deemed necessary to achieve the most satisfactory results.
7. On March 29, 1951, plaintiff submitted to the EPS a revised proposal, stating that samples of columbite material from British Guiana had been analyzed by the Bureau of Mines, which had found that the grade of the tested material was higher than required by defendant’s minimum specifications. The proposal also stated that a representative of the Foreign Economic Administration had, as a result of a brief examination, estimated that there were approximately 2 million pounds of columbite ore in one area in British Guiana. The amended proposal reiterated that plaintiff was unable to furnish any fixed delivery schedule but that shipment would start in six months after the signing of the contract and that plaintiff proposed to supply up to 2 million pounds within a 5-year period.
The proposal also stated:
‡ $ $ $ $
Having the assurance and with the help of the United States Government, we are prepared to speed up, and step up, production as rapidly as conditions will permit, by installing whatever feasible equipment may be deemed necessary to achieve the most satisfactory end results.
‡ $ $ $ $
On April 13,1951, plaintiff’s revised proposal was accepted by the EPS in a telegram from H. C. Maull, Jr., reading as follows:
UROPPER MARCH 29, 1951 TO SUPPLY APPROXIMATELY 2,400,000 POUNDS OE COLUMBITE PROM BRITISH GUIANA POR SHIPMENT 400,000 POUNDS PRIOR TO DECEMBER 31, 1952, 1,000,000 POUNDS IN 1953 AND 1954 AND 1,000,000 POUNDS IN 1955 AND 1956, C & P NEW YORK ACCEPTED CONTRACT NUMBER GS — OOP—8 7 0 (SCM) HAS BEEN ASSIGNED TO THIS TRANSACTION.
*381 8. The record with respect to plaintiff’s interest in colum-bite-bearing lands in British Guiana shows that on October 6, 1951, the Commissioner of Lands and Mines of British Guiana published in the Official Gazette notices showing the following:
(a) On April 16, 1951, J.A.E. Patterson had filed on behalf of Edward J. Willems an application for exclusive permission to explore for columbite and tantalite on 5,000 acres of land situated on both banks of Robins Creek;
(b) on April 24, 1951, J.A.E. Patterson had filed on behalf of Edward J. Willems an application for exclusive permission to explore for columbite and tantalite on an area comprising 4,500 acres of land situated on the left bank of the Rumong-Rumong River and the left bank of the Mazaruni River;
(c) on April 24, 1951, J. A. E. Patterson had filed in behalf of Edward J. Willems an application for exclusive permission to explore for tantalite and columbite on 38,700 acres of land situated on both banks of the Takatu River;
(d) on May 30, 1951, Edward J. Willems, in behalf of Willems Industries, Inc., had filed an application for exclusive permission to explore for columbite and tantalite on 20,600 acres of land situated on the left bank of the Mazaruni River, and
(e) on May 31,1951, Edward J. Willems had filed on behalf of Willems Industries, Inc., an application for exclusive permission to explore for tantalite and columbite on an area comprising 359,000 acres of land situated on the left bank of the Mazaruni River.
9. Shortly after the defendant’s telegraphic acceptance of plaintiff’s revised proposal to the EPS, Edward Willems went to British Guiana and exhibited to the Commissioner of Lands and Mines plaintiff’s revised proposal to EPS and the telegram of acceptance. Thereupon, the British authorities in British Guiana requested the American Consul to obtain verification from the State Department that a contractual relationship existed between Willems Industries, Inc., and the Government of the United States. On May 28, 1951, the Secretary of State sent the American Consul a telegram, stating that the offer by Willems Industries, Inc., *382 to furnish columbite to the Government of the United States over a 5-year period had been accepted on April 13, 1951. As a result of this telegram, plaintiff, which up to that time had not obtained any concessions to explore for or to mine columbite-tantalite in British Guiana, obtained mining concessions and exclusive permission to explore for or to mine columbite-tantalite in British Guiana. The record does not clearly show the extent of the area covered by the concessions granted to plaintiff by the Government of British Guiana, but on or about August 3,1951, during a conference with Captain Maull, Mr. Willems stated that plaintiff had obtained mining concessions from the Government of British Guiana on 1,000 acres of land in the Morabici area, upon 1,000 acres in the Rumong-R.um.ong area, and upon 10,000 acres in the Morabici-Robello Creek area. He added that the Government of British Guiana was holding in reserve for the benefit of Willems Industries, Inc., another area of 359,000 acres.
10. On or about August 3,1951, Mr. Willems and Djalma F. Wolf son, the secretary of plaintiff, had a conference in Washington with Commissioner Walsh and Captain Maull of the EPS, during which Mr. Willems exhibited plaintiff’s revised proposal of March 29,1951, and complained that defendant’s telegraphic acceptance of April 13, 1951, did not conform to plaintiff’s proposal. After studying these documents, Commissioner Walsh directed Captain Maull to prepare a contract which conformed to plaintiff’s revised offer. On August 3, 1951, following the conference, plaintiff and H. C. Maull, Jr., Acting Director of the Purchasing Division of the EPS, entered into a written contract which called for the delivery by plaintiff of 2,400,000 pounds of columbite concentrates, grade II, guaranteed to conform with national stockpile specification P-15, dated May 17, 1950. The contract provided that the columbite concentrates should be delivered by plaintiff in accordance with the following tentative schedule:
400,000 pounds with respect to which delivery was to begin not later than 6 months from the date of the execution of the contract and to be completed not later than June 30,1953;
*383 1,000,000 pounds to be delivered in approximately equal quantities over each calendar month between July 1, 1953, and June 30, 1955, and
1,000,000 pounds to be delivered in approximately equal quantities for each calendar quarter between July 1, 1955, and June 30, 1957.
The unit prices for columbite concentrates containing not less than 55 percent columbium pentoxide plus tantalum pentoxide delivered to and accepted by defendant, C&F, New York, N.Y., were specified at $1.99 per pound for the first 400,000 pounds, $1.74 per pound for the next 1,000,000 pounds, and $1.24 per pound for the balance.
The contract further stated that the materials to be supplied thereunder were to be procured pursuant to the Strategic and Critical Materials Stock Piling Act of 1946, and that the material was to be mined and exported from British Guiana, South America.
The contract also contained a provision, stating that the unit prices to be paid' plaintiff were based upon the costs of equipment, material, labor, freight, and other items as of the date of the execution of the contract, and that in the event such costs increased during the term of the contract, the contractor could request an equitable increase in the contract unit prices.
11. On August 8,1951, plaintiff requested EPS to establish a letter of credit in the amount of $100,000. On August 23, 1951, a letter of credit conforming to the provisions of the contract was established. The letter provided for sight drafts to be drawn on the National City Bank of New York for 75 percent of the invoiced amount of shipments meeting specified standards. By telegram of September 20, 1951, plaintiff acknowledged that the provisions of the letter of credit were satisfactory.
12. In order to facilitate delivery of the materials to the Government under the contract, plaintiff and EPS entered into Amendment No. 1, dated September 12, 1951.
13. On August 1, 1951, prior to the execution of the contract of August 3,1951, Mr. Willems wrote Captain Maull, complaining that the defendant’s telegraphic acceptance of April 13, 1951, did not conform to plaintiff’s revised pro *384 posal in several respects. Among other things, Mr. Willems’ letter stated:
(d) Our offer states clearly quote '•'•Raving the as-suranee and with the help of the United States Governments Your instrument neither gives assurance nor offers help.
In a conference which Mr. Willems and Mr. Wolf son had with Commissioner Walsh and Captain Maull on August 3, 1951, there was no discussion about the EPS extending financial assistance to plaintiff. However, before the contract was signed, Mr. Willems told Captain Maull that plaintiff was a small company which would have to have financial assistance from the Government or elsewhere to enable plaintiff to perform the contract. The evidence regarding these conversations is incomplete and unsatisfactory, because Mr. Willems was not called as a witness by plaintiff nor was Captain Maull called as a witness by defendant. The uncontradicted evidence shows that Captain Maull and the other representatives of the EPS with whom plaintiff negotiated, informed plaintiff’s representatives that the authority of EPS was limited by the Strategic and Critical Materials Stock Piling Act of 1946 to the purchase and procurement of materials for the national stockpile and that EPS had no authority to grant loans or to extend financial assistance to EPS contractors. At the same time, the evidence is sufficient to show that on or prior to August 3, 1951, Captain Maull informed Mr. Willems and Mr. Wolf son that the Export-Import Bank and the Economic Cooperation Administration were agencies of the Government which had authority to make loans or grant financial assistance to persons or concerns who had contracted to furnish material for the national stockpile. The evidence does not establish, as plaintiff contends, that Captain Maull, or any other representative of the EPS, promised plaintiff that any agency of the Government would loan plaintiff money or give it financial assistance for the performance of the contract of August 3, 1951. Plaintiff’s awareness of the limited authority of EPS is demonstrated by the fact that before the contract was signed, plaintiff *385 bad sought financial assistance from other agencies of the Government.
14. On April 3, 1948, the Economic Cooperation Administration (hereinafter referred to as ECA) was created for the purpose of assisting certain foreign countries to achieve economic stability and independence through the promotion of increased agricultural and industrial productivity, monetary stability, and the growth of international trade (Foreign Assistance Act of 1948, 62 Stat. 137).
15. Sometime early in July of 1951, John W. Berhman, a stockholder of plaintiff, submitted plaintiff’s written application for a loan to the ECA, attention of J. D. McClintock. The application was signed by Mr. Berhman as vice president of plaintiff, and stated that in previous discussions, Mr. McClintock had said that ECA would consider plaintiff’s application for a loan for the purpose of mining and producing columbite in British Guiana if a price could be obtained for the material that would assure repayment of the loan. The application stated that plaintiff would agree to deliver 2,400,000 pounds of columbite concentrate of the required specifications at a price of $3 per pound for the concentrates, C&F, New York, free of export duty. Plaintiff’s agreement to supply the columbite concentrate was conditioned upon the agreement of ECA to loan plaintiff the sum of $300,000 for the purchase of equipment, the payment of wages, and the procurement of supplies and materials in British Guiana. The application provided that the loan was to be repaid on the basis of 50 cents per pound of ore shipped to the United States.
On July 17, 1951, Mr. Berhman again wrote Mr. Mc-Clintock, stating that a serious difference had arisen between Berhman and Edward J. Willems; that Berhman had furnished the funds that enabled Willems to obtain the mineral concessions in British Guiana, and that upon his return from that country, Mr. Willems had agreed that if Mr. Berhman could secure a loan for plaintiff from the ECA, Willems would give Berhman a larger share in the enterprise than had been originally agreed. The letter further stated, however, that Willems had since decided that Berhman was not entitled to a larger share, notwith *386 standing the fact that Berhman had been compelled to advance further sums for the project in British Guiana.
16. On July 18, 1951, Edward J. Willems wrote J. D. McClintock of the EGA, requesting that all communications regarding the loan application that had been filed by Mr. Berhman in plaintiff’s behalf be addressed to Willems personally.
His letter also asked for a prompt expression from Mr. Mc-Clintock on plaintiff’s loan application.
17. On July 30, 1951, David E. Austen, Acting Director of the Materials Development Division of EGA, wrote Mr. Berhman in response to the loan application filed by him. Mr. Austen’s letter stated that as a first step in considering the application, it would be necessary for EOA to send an engineer to British Guiana to examine plaintiff’s mineral properties there and that plaintiff should understand that EOA was making no commitment of any kind on plaintiff’s application.
On the same date, Mr. Austen sent the following reply to Mr. Willems’ letter of July 18,1951:
In acknowledgment of your letter of July 18, 1951, we have to advise that we have already replied to Mr. Berhman’s communication in application for financial assistance for an exploration-development project in British Guiana.
In confirmation of our conversations with both Mr. Berhman and yourself, it has been distinctly understood that it is not the policy of EOA to enter into any commitments whatever prior to a field examination by our engineers.
We are very much interested in furthering the development and augmenting the production of columbite and industrial diamonds in British Guiana. We are glad to sponsor such projects but, as you know, negotiations in all respects are contingent upon our field examination of the areas involved and a favorable report and evaluation by our engineers.
No assurances of any kind have been issued, nor will they be, prior to completion of the data mentioned. This applies to price as well as all other proposed contractual arrangements.
It is quite impossible to anticipate these circumstances. We are well aware of the contingencies surrounding your concessions and fully appreciate the *387 timp. element involved. It is our feeling that the arrangements suggested in our letter to Mr. Berhman take adequate cognizance of the entire situation and beyond the possible effects of the river and creek flats being flooded at this time of year, we should expect no undue delay.
On August 9, 1951, after the receipt of Mr. Austen’s reply, Mr. Willems wrote ECA, withdrawing the loan application filed by Mr. Berhman in behalf of plaintiff and requesting a conference where Mr. Willems could discuss plaintiff’s application personally with Mr. Austen at the earliest opportunity.
18. On September 11, 1951, Mr. Willems, in behalf of plaintiff, submitted to Mr. McClintock of ECA an additional application for financial assistance for the purpose of enabling plaintiff to purchase the necessary equipment for producing columbite in fulfillment of plaintiff’s contract with EPS. Attached to the letter was a list of the equipment plaintiff proposed to buy at an estimated cost of $179,648 and the statement that an additional expenditure of $150,000 would be needed to install and commence the operation of the equipment after its arrival in Georgetown, British Guiana.
On September 12, 1951, Mr. Charles E. Stott, Director of the Materials Development Division of ECA, replied to the second loan application as follows:
With reference to your letter of September 11, 1951, requesting financial assistance in connection with a project to mine Columbite-Tantalite from your concession in British Guiana, we note that a contract has been concluded between your company and General Services Administration and that a letter of credit in your favor has been established at Georgetown through the National City Bank.
Your preliminary estimates indicate that approximately $330,000 will be the capital required to equip, explore, and exploit the property to the point of sufficient production to make it self-sustaining and show a profit.
In the event that your company will provide the funds necessary to cover all local currency costs such as inland transportation of equipment and its installation, labor, supplies and general operating capital to the end mentioned above, the Economic Cooperation Administration *388 would be glad to entertain your proposal of participating in the project to the extent of providing XJ.S. dollar funds to cover the cost of the equipment required and its transportation from this country to Georgetown. At the moment, this would appear to be, roughly, a 50 percent participation.
We must reserve judgment as to the final determination of the type, description and specifications of the equipment recommended.
Our suggestion is also made entirely contingent upon the results of an examination of your property by an ECA engineer and his report and recommendations. Arrangements have been made for one of our engineers to be in British Guiana, probably early in October.
In accordance with our policy, ECA participation in these types of projects takes the form of an advance against production. Such advances are liquidated from shipments of concentrates at a rate to be determined after all other pertinent data concerning the operation has been assembled. Such deliveries in repayment to ECA, of course, would have priority over any other obligations of the company.
We should appreciate your advising us how to contact you or your representative in British Guiana and what other arrangements may be necessary to facilitate examination by our engineer.
19. Sometime prior to September 11, 1951, Mr. Willems made an application in behalf of plaintiff to the Export-Import Bank for a loan to assist in the development of columbite on the lands in British Guiana.
On September 11, 1951, Mr. Willems forwarded to the Bank additional data and information which the Bank had requested in connection with its consideration of the loan application.
On September 27, 1951, plaintiff’s Mr. Wolfson received a telephone call from Mr. Bipple of the Export-Import Bank regarding the lack of a financial statement in plaintiff’s application for a loan. On the following day, Mr. Wolfson wrote Mr. Willems, who was then in British Guiana, as follows:
Your letter of Sept. 25 received and I am replying to same immediately.
Yesterday I received a telephone call from Washington a Mr. Eipple from the Export-Import Bank. The *389 first thing he stated was that there was no financial statement attached. I handled the situation very adrotly [sic] I believe. I said the reason was there was no need for we had no liabilities and that in our small way we were paying our way as we went (that we were operating in a small way now — that is why we went to the Export-Import Bank). He asked me how much we had in the deal. I said $75,000.00 approx, (taking into consideration that you have mentioned $50,000.00 along the line).
(2) Then he said the cost of the road item what was that based on? I said of course it is based on U.S. Currency to be paid naturally in B.G. Currency. That did not bother him much but (3) Then he said in our setup, there is accounting and legal expenses and then large administration expenses, and before he had a chance to finish I said, “We need and want your cooperation and as for the above items we will be flexible, and as long as the loan with Export-Import Bank is outstanding, salaries will meet with their approval as our Company and its officials were anxious to do a job to get the ore out for the GSA, and salaries were secondary (WHAT A LIAR.) I put it on thick. All he could say was “I am glad to hear you talk that way”, and you will definitely hear from us..
From present indications I believe I shall be in Washington next week. At which time I’ll check with Export Bank and with McClintock, EGA, and advise you accordingly.
sfs :ji ❖ ❖
20. On September 8, 1950, the Defense Production Act of 1950 (61 Stat. 798) became effective.
On September 9,1950, the President delegated to the Secretary of the Interior the authority contained in the Defense Production Act of 1950, with respect to the exploration, development, and mining of strategic and critical metals and materials. The Secretary created within the Department of the Interior a Defense Minerals Administration to which he delegated the authority received from the President. Thereupon, the Defense Minerals Administration turned to GSA to serve as the contracting agency in procurement, and GSA assigned the work to EPS.
As a result of this action, EPS was, during the remainder of 1950, responsible for contracting for the procurement of *390 strategic and critical materials, subject to policy determinations by the Munitions Board under the Stock Piling Act of 1946, or by the Defense Minerals Administration, under the Defense Production Act of 1950.
21. On August 28, 1951, by Executive Order No. 10281 (16 F.K. 8789), the President created the Defense Materials Procurement Agency (hereinafter referred to as the DMPA) and by that order transferred to DMPA, the following authority:
Sec. 303. The Defense Materials Procurement Administrator is hereby authorized and directed to purchase and make commitments to purchase metals, minerals, and other materials, for Government use or resale, as authorized by and subject to the provisions of section 303 of the Defense Production Act of 1950, as amended: Provided, That the Secretary of Agriculture is also authorized to exercise the said functions under section 303 of the said Act, as amended, with respect to food.
Sec. 304. The Defense Materials Procurement Administrator is hereby authorized and directed to encourage the exploration, development, and mining of critical and strategic minerals and metals, as authorized by and subject to the provisions of section 303 of the Defense Production Act of 1950, as amended.
Sec. 305. The Defense Materials Procurement Administrator is hereby authorized and directed to make subsidy payments, to determine the amounts, manner, terms, and conditions thereof, and to make findings, as authorized by and subject to the provisions of section 303(c) of the Defense Production Act of 1950, as amended.
22. When the DMPA was created, Mr. Jess Larson, who had theretofore been appointed Administrator of GSA, was also named Administrator of DMPA. With the organization of DMPA, certain personnel were transferred to it from other agencies and among these was James D. McClintock, who became a regional specialist in the Foreign Expansion Division of DMPA.
23. As a result of the actions described above, the responsibility for procurement contracting, as well as the responsibility for the determination of policies affecting procurement under the Defense Production Act of 1950, was transferred *391 to the DMPA. EPS was relieved of any responsibility it had for procurement under the Defense Production Act of 1950 but retained its procurement responsibility under the Stock Piling Act of 1946.
24. Sometime in December 1951, Mr. Willems learned that J. D. McClintoek had been transferred from EGA to DMPA and that that agency had assumed functions which had formerly been carried out by ECA. On December 11,1951, he mailed to DMPA for the attention of Mr. McClintoek an application for a loan to be made to plaintiff in the sum of $153,720 for the exploration and prospecting of columbite on 12,000 acres of land in British Guiana.
Charles E. Stott, Director of the Foreign Expansion Division of DMPA, replied to Mr. Willems’ application by letter of December 12, 1951, which read in pertinent part as follows:
# * # ❖ ❖
Our usual contracts covering exploration projects of this nature which involve a share-the-risk undertaking, require some financial participation by the operator. Policy has established this at a minimum of 30 percent. In preparation of such a contract, a rather detailed proposed program should be laid out. This should indicate the various steps and procedures it is intended to follow, location and prospecting methods, a breakdown of equipment and labor required, engineering and supervision, and a division of all cost estimates in terms of U.S. dollar and local currency needs over the estimated time. The question of engineering supervision and management will have a very important bearing on our consideration of your application.
The matter of credits against your company participation in capital expense by virtue of previous initial expenditures has never been allowed on the basis of the costs of property acquisition. We would, of course, give proper weight to the more recent expenditures which were incurred directly for the benefit of the property in terms of actual direct costs for prospecting and development. In order to qualify for such credits, these expenditures must be properly documented and described for review of our comptroller. Therefore, I would suggest that you amend your application with the data mentioned, indicate to what extent your company is prepared to make capital contribution, and advise us what *392 engineering and management controls yon have in mind.
In connection with the last problem, I would suggest the employment of an experienced placer operator, preferably with a background of geological experience. Perhaps some suggestions along this line could be made by Mr. Grant or through this office.
25. Philip M. McKenna, president of Kennametal, Inc., a Pennsylvania corporation having its principal office in Latrobe, Pennsylvania, heard that Willems Industries, Inc., had acquired interests in columbite-bearing properties in British Guiana. Mr. McKenna was interested in columbite, because his company had used columbite carbide for years as an ingredient in the manufacture of cutting tools. It also had tried to manufacture a titanium carbide, a composition of titanium and columbite, for use in the manufacture of gas turbine parts. His company learned through various Government organizations that there was going to be a much greater need for columbite than in previous years, and he began looking for properties that might contain enough columbite to prove commercially interesting. As a result of a telephone call he made to Edward J. Willems, the latter visited Kennametal’s office at Latrobe on December 27,1951, bringing with him samples of columbium concentrates from British Guiana, information showing the lands on which Willems Industries, Inc., had exclusive exploration rights in British Guiana, and the letter written to plaintiff by Mr. Stott of DMPA on December 12, 1951. There was considerable discussion about Kennametal, Inc., joining with Willems Industries, Inc., in the British Guiana venture. Later, it was agreed that the parties would meet in the Willard Hotel in Washington, D.C., on Tuesday, January 15, 1952, to discuss the matter further and to call on representatives of the DMPA.
After the meeting at Latrobe, Mr. Willems and Mr. Wolf-son of plaintiff informed Mr. McClintock that they were negotiating with Kennametal, Inc., to join plaintiff in the venture. Mr. McClintock was elated with this information and urged plaintiff to work out an arrangement with Ken-nametal, stating that it was a good organization with min *393 ing experience and that tlie Government would approve of Kennametal’s joining in the venture with plaintiff.
26. On January 14,1952, Mr. McKenna and K. J. Flickin-ger, secretary of Kennametal, Inc., called on James D. Mc-Clintock at his office in Washington. Mr. McClintock told them that Mr. Willems had been talking with him for six months about the columbite deposits in British Guiana and had been told by McClintock that DMPA would not advance a cent to plaintiff until DMPA was satisfied as to the management of the exploration work. McClintock indicated that the DMPA might advance from 70 to 75 percent of the exploration costs and that it might participate in the development costs. He stated that the amount advanced by DMPA was to be repaid by deliveries of columbite, and that the major terms of the DMPA contract could 'be worked out in about 15 minutes. He also named several qualified engineers and suggested that one of them should be put in charge of the operations in British Guiana. Before the conference adjourned, it was agreed that a meeting would be held on the following day in the office of Mr. Stott, the Director of the Foreign Expansion Division of DMPA, to discuss the proposed loan application to DMPA.
27. At 9:15 on the morning of January 15, 1952, Messrs. Willems and Wolf son of plaintiff met with Messrs. Mc-Kenna and Flickinger of Kennametal, Inc., in the Willard Hotel to discuss the joint venture. After Mr. Willems had pointed out that his company had already advanced from $30,000 to $35,000 on the project, it was agreed that Ken-nametal, Inc., would advance an initial amount of $50,000 for the exploration of columbite and that subsequently it would put up an additional $150,000 in return for 50 percent of the stock in Willems Industries, Inc.
28. At 10:30 a.m. on the same day, the group conferred with Mr. McClintock and Mr. Stott in the latter’s office in the DMPA. Mr. Stott explained that the DMPA did not make advances to contractors unless it appeared that there was not only a critical need for the material involved in the exploration but also a reasonable expectation of finding the material on the lands involved. He suggested that the *394 applicants’ exploration plans be discarded in favor of a development program, in aid of which, the DMPA could extend more liberal terms.
However, Mr. Willems and Mr. McKenna stated it would be necessary to explore the lands first. After some discussion about the amount of funds that would be required by the applicants, Stott indicated that he would be willing to proceed on the basis of McClintock’s recommendation but that it would be necessary for plaintiff and Kennametal, Inc., to present a development plan showing in detail the equipment to be used, the period of time involved, the management of the project, and other information.
The applicants then went to McClintock’s office. He suggested that they submit a complete application and said that he would refer it to the legal staff of DMPA with the expectation that the lawyers could complete the preparation of a contract by January 21, 1952. McClintock advised them that before any advance was made by DMPA, it would be necessary for Mr. Stott to approve the contract, and that thereafter it would be submitted to Howard Young, the Deputy Administrator, and then to Jess Larson, the Administrator, for his signature and approval.
During the afternoon of January 15, 1952, plaintiff and Kennametal, Inc., drafted a memorandum agreement, which stated in substance as follows:
(a) Willems Industries, Inc., and Kennametal, Inc., had applied to DMPA for an exploration loan of $150,000 to be made to plaintiff to supply funds for the exploration of columbite-tantalite, and other minerals on the lands in British Guiana;
(b) if the loan was approved in the sum of not less than $150,000, Kennametal agreed that it would advance plaintiff the sum of $50,000 to be used for the same purposes as the DMPA loan; the advance by Kennametal was to bear no interest but was to be refunded before any cash dividend was distributed by plaintiff;
(c) the $28,000 which Willems Industries, Inc., had previously advanced for exploration was to be repaid without interest before any cash dividend was distributed by the company;
*395 (d) if, after exploration, the parties determined that columbite-tantalite and other minerals were present under such conditions and in such quantities and grade as to warrant extraction, it was agreed that Kennametal would subscribe and pay $150,000 for 50 percent of the outstanding stock of Willems Industries, Inc., but if Kennametal, Inc., for any reason decided not to go into production after exploration, Willems Industries, Inc., was to be under no further obligation to Kennametal, Inc., and would be free to proceed with production if it chose to do so.
29. On the afternoon of January 15,1952, the representatives of plaintiff and Kennametal, Inc., also prepared a detailed application to be submitted to DMPA for an exploration loan of $150,000 to be made to plaintiff to enable it to further explore and prospect areas of columbite-bearing lands controlled by it in British Guiana. The application stated that Willems Industries, Inc., had already expended $28,000 on exploration, that the additional exploration was expected to cost $200,000, that $50,000 was to be advanced by Kennametal, Inc., and that $150,000 was to be loaned by DMPA. The application also stated that it was estimated that the exploration could be completed in one year and that, if a mining operation appeared to be justified, an application for a further advance of funds would be made to DMPA. In the event mining was undertaken, it was estimated that repayment to DMPA could be made within 5 years after full-scale production, at the rate of $30,000 per year, but all repayment was to be made in concentrates delivered to and accepted by GSA. The application was signed by plaintiff, but Kennametal, Inc., certified to the correctness of all statements therein relating to it.
On the following morning, the group presented the application to Mr. McClintock, who said that if the officers of Kennametal, Inc., were satisfied with Messrs. Willems and Wolfson, he would be. Mr. McClintock also stated that after the proposal had been approved by himself and by Mr. Stott, it would be handed to the Legal Division of DMPA for scrutiny; after that, the proposal would be forwarded to the Administrator, who would likely give it to his deputy, *396 Howard Young, for consideration; if Mr. Young recommended it, Mr. Larson would approve the proposal.
30. On January 17, 1952, Mr. McClintock wrote plaintiff that an analysis had been made by the Bureau of Mines on December 27,1951, of a sample of alluvial concentrates from plaintiff’s properties in British Guiana and that the results of the analysis indicated that the concentrates were acceptable to the Government under stockpile specifications. Mr. McClintock also wrote that he presumed that the material would be acceptable under the contract which had been entered into between EPS and Willems Industries, Inc., on August 3,1951.
31. On January 23, 1952, Mr. McClintock wrote plaintiff the following letter and sent a carbon copy thereof to Kennametal, Inc.:
Referring to your application in conjunction with Kennametal, Inc., for an advance against production pursuant to recommended development program in British Guiana has been approved in principle.
Arrangements have been made for a conference next Monday to work out the details of a contract.
Sincerely yours,
James D. McClintock,

Regional Specialist, Foreign Expa/nsion Division.

32. At the time the foregoing letter was written, the procedure in effect in DMPA with respect to loans or advances made by it included the following steps:
(a) The regional specialist in charge of the geographical area concerned would review the project to determine whether it had merit and fell within one of the approved DMPA programs. If he so decided, he would discuss the project with the applicant and together they would reach a tentative agreement as to the extent of the project and the manner in which it would be carried out. This tentative agreement was termed “an agreement in principle”;
(b) at this point, the regional specialist would' write a brief summary of the project and present it to the Director of the Foreign Expansion Division, with the recommendation that negotiations be continued for the purpose of arriving at a contract, if possible;
*397 (c) if tbe Division Director approved the summary, the regional specialist would then proceed with the assistance of the legal staff and members of the Comptroller’s staff to work out the details of a contract with the applicant. When the parties arrived at a meeting of the minds as to the terms of the contract, a draft of the contract would then be prepared and presented to the Division Director for his approval. If he approved it, it would then be sent to the Administrator for his signature, or in his absence to the Deputy Administrator.
Although the evidence does not show that either plaintiff or Kennametal, Inc., had actual or constructive notice of this procedure or of the meaning ascribed by DMPA to “an agreement in principle”, Mr. McClintock’s letter of January 23, 1952, stated that it would be necessary to prepare a detailed contract. Previously, the representatives of plaintiff and of Kennametal, Inc., had been notified that any contract involving an advance of funds by DMPA would have to be signed by the Administrator, or in his absence, by the Deputy Administrator.
33. In accordance with arrangements previously made, Messrs. Willems, Wolfson, and Flickinger met in Mr.Clin-tock’s office on January 28,1952, to discuss the details of the proposed contract under which DMPA was to advance $150,-000 for the exploration in British Guiana. At the beginning of the meeting, Mr. McClintock stated that the DMPA had decided, for psychological reasons, to change the project from an exploration to a development contract, under the terms of which Kennametal, Inc., would be firmly bound to repay the $150,000 advanced by DMPA, even if the project produced no columbite. Mr. Flickinger immediately informed Mr. McClintock that such an arrangement would be entirely unsatisfactory to Kennametal, Inc., and would never be authorized by its board of directors. Mr. McClintock then stated that he would have to make a new presentation of the proposal to the head of the Foreign Exploration Division, as well as to Mr. Howard Young, the Deputy Administrator of DMPA.
Mr. McClintock introduced the applicants to Ward B. Chamberlain, an attorney in DMPA, who had formerly been *398 employed by tbe Economic Cooperation Administration, and on tbe following morning the applicants met in Mr. Chamberlain’s office to go over the form of a contract which had been used by the ECA. The blank form (in evidence as plaintiff’s exhibit 30) provided in general that the contractor had already expended a stated sum for preliminary exploration and that the ECA would advance an additional sum for the purchase of machinery, equipment, and special services of U.S. origin for use in the exploration program, which was to be completed within a time specified. The form also provided that if the contractor estimated that the deposits he found justified commercial production, he was to notify the ECA, and if it determined that commercial production should be undertaken or if the contractor undertook commercial production at any time within 15 years, the amount previously advanced by ECA for exploration was to be paid by the delivery of materials to the Emergency Procurement Service of GSA. At the conclusion of the conference, Mr. Chamberlain stated that he would prepare a rough draft of the proposed contract and forward one copy to plaintiff and one copy to Kennametal, Inc., for further consideration.
34. On February 5, 1952, Mr. Flickinger forwarded to DMPA for the attention of Mr. McClintock, a number of documents which DMPA had requested in connection with its consideration of the application for loan. Included among these documents was a “Bequest for Serialization by Foreign Mines and Smelters Located in Countries For Which ECA is the Claimant Agency.” The purpose of the serialization was to facilitate the issuance of priorities and allocations for mining equipment and for items of maintenance repair, plus operating supplies, for essential mines, smelters, and mineral processing plants.
In his letter, Mr. Flickinger stated that plaintiff and Ken-nametal had made arrangements for the Bank of Manhattan to act as depository of the funds to be advanced by DMPA and by Kennametal, Inc., that the companies were proceeding on the basis of the assurances made to them in Washington, and that they would appreciate Mr. McClintock’s assistance in expediting the preparation of the draft of the proposed contract with DMPA.
*399 Mr. McClintock acknowledged receipt of the papers in a reply of February 15,1952, which also stated:
* * * * *
It is, of course, encouraging to see progress toward bringing the British Guiana holdings of Willems Industries, Inc., into production. However, it should be pointed out that preparation of the legal documents is not the only impediment to early consummation of the contract for financing of the proposed Exploration Program. As you know, Willems Industries, Inc., has entered into a contract with the United States, through the Emergency Procurement Service, General Services Administration, for the delivery of columbite and tantalite from the properties involved in this project. Under this contract, deliveries were to commence not later than six months after its execution (August 3,1951), and the first 400,000 pounds of concentrates are to be delivered “not later than June 30, 1953”. The delivery and pricing terms of this contract involve several factors for consideration in the proposal for financing the Exploration Program.
In addition, the transfer of the responsibility for the encouragement of the development of strategic materials from the Mutual Security Agency (successor to the Economic Cooperation Administration) to Defense Materials Procurement Agency has raised several questions, including the immediate availability of American dollar funds for advances, as distinguished from local currency — British Guiana dollars, in this instance.
The preparation of a draft of the contract is proceeding. It is hoped that we may soon have a suggested form of document to serve as a basis for finalization of our agreement in principle. The execution of a contract is, of course, a prerequisite to the earmarking of government funds for the contemplated purposes.
The question raised in Mr. McClintoek’s letter of February 15, 1952, regarding plaintiff’s contract with the EPS was not the first occasion on which this matter had been discussed by the parties. When Mr. McKenna attended the meetings in Washington on or about January 15, 1952, he expressed to Messrs. Willems and Wolf son and to the DMPA representatives his strong objections to plaintiff’s contract with EPS. Mr. McKenna described the contract as a “millstone around the neck of plaintiff”, and expressed the opinion *400 that it would, be impossible for plaintiff to perform the contract. He also stated that it would be much better to sell the columbite concentrates at the prices prevailing at the time the deliveries were made, since he felt that prices at that time would be much higher than the unit prices set forth in plaintiff’s contract with EPS. Neither Mr. Willems nor Mr. Wolfson would agree that the EPS contract should be canceled. On several occasions during his negotiations with representatives of plaintiff and Kennametal, Inc., Mr. McClintock advised them that the EPS contract would have to be canceled, since the DMPA wanted the columbite material. In reply, Messrs. Willems and Wolfson stated that since plaintiff’s mineral concessions in British Guiana had been obtained on the strength of the EPS contract, they would not agree to its cancellation unless the Government would give plaintiff a contract which was equally as good or better than the EPS contract.
35. By letter of February 18,1952, Mr. Fliekinger reported to the DMPA (attention of Mr. McClintock) that Mr. Willems had gone to British Guiana to begin preliminary work on the exploration project and that Kennametal, Inc., had advanced him a total of $10,000 in cash to get the project moving. The letter also stated in part:
Your letter of Feb. 15 has been received and contents noted. We shall depend on your Division to straighten out any problems involved in the availability of American dollar funds for expenditure in British Guiana. Also, we believe that the Willems Industries— G.S.A. contract can be modified to permit the Willems— Kennametal — D.M.P.A. contract to become operative.
sji :¡i % sN
This information will show you that Willems Industries, Inc. and Kennametal, Inc. are moving forward on the project with all speed possible. We trust that your Division will follow the preparation of the contract and will work out the problems pertaining to the availability of American dollar funds to be spent in B.G.
36. On March 7, 1952, Mr. Willems and Mr. Fliekinger met with Mr. McClintock, who presented to them a copy of the rough draft of the proposed loan agreement under which DMPA was to advance $150,000 for the project. The *401 parties spent the morning going oyer the draft with respect to which Mr. Willems and Mr. Flickinger raised 44 points of discussion. During the meeting Mr. McClintock stated that a new DMPA regulation was to be released within a short time, establishing a new schedule of prices to be paid by the Government, with a premium on the high percentage concentrates. He said he could not reveal the new base prices but believed they would be substantially higher than the prevailing market price for the concentrates.
Mr. McClintock introduced Messrs. Willems and Flick-inger to John Began, another DMPA attorney, who had been assigned the task of completing the rough draft of the contract when Ward Chamberlain was sent to a job in France. Mr. Willems and Mr. Flickinger spent the remainder of the afternoon and the entire following day with Mr. Began. They suggested numerous changes to and deletions in the proposed contract, but Mr. Began informed them that he had no authority to agree to the changes and that many of requested deletions and amendments might be restored before the contract was signed.
37. Upon Mr. McClintock’s recommendation, Kennametal, Inc., employed Eobert Hippier, a mining engineer, to superintend the exploration in British Guiana. The engineer agreed to report to Latrobe, Pennsylvania, on March 24,1952.
38. By letter of March 11, 1952, Mr. McClintock advised plaintiff and Kennametal, Inc., that as a result of organizational changes in DMPA, Clarence A. Fredell had been placed in charge of the region in which British Guiana was included and that the contract then under negotiation would necessarily have to be finalized by Mr. Fredell.
39. On March 12,1952, the Deputy Director of the Mining Eequirements Division of DMPA, wrote Kennametal, Inc., that the application for mine serialization (finding 34) had been approved by DMPA.
40. During the latter part of February 1952, Mr. McClintock reviewed with Mr. Fredell the status of the negotiations with plaintiff and Kennametal, Inc. He expressed the opinion that there was a prospect of obtaining columbite from British Guiana if the project was placed *402 under proper management, but be added: “As long as we’ve got Sir. Willems in the saddle down there, we are not going to get to first base; we can’t trust that guy with one thin dime of Government money.” He also said that if Kenna-metal, Inc. managed the explorations and trained engineers were employed to supervise the work, there was a good chance of developing the columbite ore. Mr. McClintock also informed Mr. Fredell that an agreement in principle had been made with plaintiff and Kennametal, Inc., but advised that unless the applicants would agree to let Kenna-metal, Inc., have charge of the management of the project, DMPA should not enter into the contract.
On April 2, 1952, Mr. McClintock telephoned Mr. Flick-inger, stating that Edward J. Willems was entirely unacceptable to the DMPA as the principal head of the exploration project. He also advised that the DMPA had not yet released the proposed new pricing schedule.
41. On April 5, 1952, Mr. Willems met with Messrs. McKenna and Flickinger in the offices of Kennametal, Inc., at Latrobe, Pennsylvania. Mr. Willems raised strenuous objections to the fact that Robert F. Hippier, the engineer employed by Kennametal, was to be in charge of the project in British Guiana. Mr. Willems stated that he resented having an outsider brought in and that he wanted to remain as the head man of the mining project. He later told Mr. Flickinger that he would have no objections to Hippier if the engineer were on the plaintiff’s payroll, because he felt that if Hippier were paid by Kennametal, Inc., he would report to that company, whereas if he were paid by the plaintiff, he would be an employee of plaintiff and would be required to report to it.
42. On April 11, 1952, Mr. Flickinger wrote the Bank of Manhattan, which had been previously selected as a depository by plaintiff and Kennametal, Inc., that as a result of various meetings with DMPA officials in Washington, it had been definitely decided to go forward with the project, that the first step would be the establishment of an escrow agreement under which Willems Industries, Inc., would deposit *403 470 shares of its capital stock against the payment by Ken-nametal, Inc., of $141,000 to Willems Industries, Inc., and that the second step would be the opening of a joint control bank account in which the money advanced by the Federal Government and by Kennametal, Inc., for conducting the exploration in British Guiana would be deposited.
As shown in subsequent findings, neither of the steps mentioned was taken.
43. On April 15, 1952, Messrs. Willems, Wolfson, and FlicMnger met in the DMPA offices in the GSA building in Washington, D.C., with Messrs. Fredell, McClintock, and Sol Elson of DMPA, the latter being a DMPA attorney, who had just been assigned to do the legal work on the project in lieu of John Began, whom he succeeded. During the meeting, a sharp disagreement arose between Mr. Willems and the DMPA officials over (1) the proposed cancellation of plaintiff’s contract of August 3, 1951, with EPS, (2) the management of the exploration in British Guiana, and (3) the disallowance of Mr. Willems’ salary and certain other expenses he proposed to charge to the project. As a result of the disputes, the negotiations for the loan terminated and no further efforts were made to complete the preparation of the proposed contract between the applicants and the DMPA. The matters that transpired at the meeting are shown in the following notes kept by Mr. Flickinger:
‡ ‡
Meeting — 1Tuesday—April 15
Arrived at D.M.P.A. office — Boom 7120 General Services Bldg., Washington, D.C. at 9:15 A.M., and found a ‘staff’ meeting in progress. Our appointment was for 10 o’clock. At 10:15 McClintock appeared and introduced Sol Elson, attorney attached to the General Counsel’s office for D.M.P.A. Elson is now the third attorney for the government to enter the case. As usual, he knew nothing about it, having been handed the entire file just the day preceding.
Elson and Clarence Fredell, who has succeeded Mc-Clintock in handling our B. G. project, started off with *404 the remark that “there is a small hope only that the present plan between Willems-Kinc. and the gov’t, can be worked out, unless there is a limitation on Willems authority. Further delays in working out the contract are imminent — unavoidable”. “There is a bitter feeling in D.M.P.A. and in British Guiana toward Willems.”
At 11:30 A.M. Willems and Wolf son arrive. Wolf-son asks, “Is our contract in the final stage?”
Elson says — -“No! There are two unsettled questions. (1) Pricing schedule. (2) Willems outstanding G.S.A. contract for 2,400,000 lbs. Cb.” * * * 12:00 noon. (April 15,1952)
Discussion of Willems’ G.S.A. contract followed. Elson tells Willems that D.M.P.A. thinks Willems pulled a ‘fast one’ in getting the G.S.A. to negotiate the contract. Elson says the exploration project will not be approved until Willems cancels the G.S.A. contract. Willems refuses, says that the contract is his ‘life blood’. (At Latrobe on April 5, Willems said he would abide by Mr. McKenna’s decision on the matter.)
Elson — “If this D.M.P.A. contract is not approved, then your G.S.A. contract will fall flat!”
Willems — “Decidedly not. I can go to B.G. tomorrow and start to produce!”
Elson — “If that is the case, why did you bother to come to the government and Kennametal for assistance?”
Willems — “Because we were sent to the government by Capt. Maull.” (Editorial note — This is a lame excuse, if there ever were one.)
Elson — “I question that you can go to B.G. tomorrow and start.”
Willems — “Emphatically, yes!”
E.J.F. — “Perhaps that is the thing for you to do.” 12:10 P.M. We try to get Clarence Fredell out of a conference with three men in his office who are there on a Brazil deal.
12:80 Elson suggests that a subsidiary company be formed, or that K. Inc. be the contract.
Willems — “That is definitely out!” “We have what is valuable in B.G. and we do not intend to part with them (the concessions.) That is final! ”
12:35 P.M. Elson leaves — he says he has an appointment, and will meet with us in the afternoon of April * * *
12:40 to 1:00 P.M. Fredell and Willems argue about expending project funds on rentals and other items which McClintock reported to us on April 5 that would be disallowed.
*405 K.J.F. asks Willems — “Wiry aren’t yon satisfied with the arrangement made at Latrobe, proposed by George T. Kearns, whereby Kennametal would buy 30 shares of Willems Industries stock for $9,000 to cover these so-called ‘Unallowable’ expenses?”
Willems — “I’m afraid that my salary might be cut off or disallowed while I am in the ‘bush’.”
Fredell — “No past expenditures for services will be allowed as cost of the project. No staff officers of K. Inc. or Willems should be allowed compensation out of project funds. To be paid, the payee must actively work on the project”.
Willems — “My pay is paramount. Either I get paid or no one goes into the bush. Hippler’s pay is secondary. We can get along veiy well in B.G. without Hippier.” “We are faced with the situation in B.G. which calls for prompt action.”
Willems reads letter from Fernandes, office manager in B.G., requesting additional funds immediately, stating that men are getting angry at not being paid, suppliers refuse to deliver goods, and things generally are in “a hell of a mess”. B..J.F. says K. Inc. will not advance another cent until there is a contract.
In discussing expenses of Willems and Hippier, Fre-dell said he would O.K. Hippler’s expenses and not Willems’.
Willems — “The govermnent will not sanction an engineer’s salary and deny me mine so long as we ‘own’ the land. Is that right, Cy ? ”
Cy Wolfson — “Yes!”
1:30 P.M. B..J.F. asks — “Mr. Fredell, is this contract being delayed because of K. Inc’s participation therein, or because of Willems ?”
Fredell — -“It is because this is a 3-party contract, and each party wants to maintain its supremacy. It is an undesirable situation. We don’t want Willems to control the project.”
Willems — “Are Hippler’s expenses to Washington to make a report allowable?”
Fredell — “Yes.”
Willems — “Are my expenses to Washington allowable?”
Fredell — “No!”
* * ❖ * *
2:00 P.M. Time out for lunch — agree to meet Fredell at 3:00 P.M. * * *
*406 At 6:00 P.M. McClintock proposed that K. Inc. be the managing director, employing Willems and Hippier and directing their activities. Willems agreed, (in the morning he had said “Definitely not. This is final.”)
44. On April 17, 1952, Kennametal, Inc., notified plaintiff by letter that Kennametal, Inc., had decided to discontinue negotiations with plaintiff and DMPA with respect to the project for the exploration of columbite-tantalite in British Guiana. The decision was based on two grounds:
(1) The refusal of plaintiff to agree to the cancellation of the contract which plaintiff entered into with the EPS on August 3,1951, and
(2) the officials of Kennametal, who had been dissatisfied with the numerous delays that had occurred in the negotiations for the DMPA loan, were convinced as a result of the conference of April 15, 1952, that the DMPA loan would never be approved because of the basic disputes between Willems Industries, Inc., and the DMPA officials.
45. A copy of Kennametal’s letter of April 17, 1952, was sent to the DMPA, and upon receipt thereof Mr. Fredell advised his superiors that the negotiations for the DMPA loan had terminated and that the matter was closed.
46. On April 22, 1952, plaintiff replied to Kennametal’s letter of April 17, 1952, stating the action constituted an anticipatory breach of the contract the two companies had executed on January 16, 1952; that plaintiff had incurred expenses and made commitments in British Guiana in reliance on KennametaPs assurances that it would advance money to plaintiff, and that as a result of Kennametal’s decision, the damages flowing therefrom might be irreparable.
47. After April 17,1952, plaintiff had no funds with which to continue exploration for columbite in British Guiana and abandoned operations in that country about August 1, 1952. On or prior to December 31, 1952, the mineral concessions which had been granted to plaintiff in British Guiana were canceled by the British Government because of plaintiff’s *407 failure to comply with, the terms and conditions of such concessions.
48. In July 1952, plaintiff learned that Kennametal International, S.A., a subsidiary of Kennametal, Inc., was negotiating with the authorities in British Guiana to obtain mineral concessions for the exploration of columbite-tanta-lite in that country. Plaintiff made an unsuccessful attempt to enjoin Kennametal International, S.A., from operations in British Guiana.
In 1952 Kennametal International, S.A., produced 800 pounds of columbite from the land and sent it to Latrobe for analysis. Eventually Kennametal International, S.A., obtained mineral concessions on approximately 75,000 acres of land in British Guiana that had formerly been included in the concessions held by plaintiff.
49. Thereafter, plaintiff filed suit against Kennametal, Inc., and against its president in the United States District Court for the Southern District of New York. This action was settled on December 8, 1958, by a stipulation of the parties, providing, in part, that Kennametal, Inc., and its subsidiary would transfer and quitclaim to plaintiff any rights or permissions which it had to explore for or to mine columbite-tantalite in British Guiana and that it would not for a period of 5 years from the date of settlement directly or indirectly engage in the exploration for, the mining of, or the production of columbite-tantalite in that countiy. The operations of Kennametal International, S.A., in British Guiana were closed down in 1953 and before it had produced columbite-tantalite in commercially paying quantities.
50. Plaintiff made no deliveries of columbite concentrates to the EPS under the contract of August 3,1951, and plaintiff’s right to proceed under that contract was terminated by the Government on February 17, 1953. The following is a summary of the correspondence which was exchanged between the parties between January 10,1952, and the date of termination, with respect to deliveries under that contract:
(a) On January 10, 1952, and again on April 7, 1952, the contracting officer wrote plaintiff requesting that it furnish *408 tbe EPS with a schedule showing the approximate quantity of columbite concentrates that would be available for shipment in the first calendar quarter of 1952 — all as required by Article 3 of the EPS contract.
(b) By letter of April 17, 1952, plaintiff replied by requesting that its letter of credit be extended to the end of 1952 and that the provisions of the contract be changed to provide for a chemical analysis of the concentrates in British Guiana. The letter also stated that plaintiff’s camp at Morabici was ready and that plaintiff intended to provide the EPS with some concentrates by June or July of 1952.
(c) On May 21, 1952, plaintiff wrote the EPS that it planned to start production of approximately 500 pounds per week of columbite and hoped to be able to produce approximately 1,000 pounds a week by August or September of 1952. The letter stated that after shipment to EPS had begun on a limited basis, plaintiff hoped to obtain a loan from the Government to enable plaintiff to obtain the tools and equipment needed to fulfill its contract with EPS.
(d) On May 28, 1952, plaintiff made another written report to the EPS, stating that plaintiff contemplated shipping 25,000 to 30,000 pounds of concentrates to EPS by the end of 1952 but that much depended on plaintiff’s ability to get the necessary equipment to increase its output. The letter again requested a renewal of the original letter of credit and an authorization for the inspection and certification of the material in British Guiana. On the next day, plaintiff again wrote the EPS, requesting that the contract be amended to advance the original shipping date to the end of 1952.
(e) The contracting officer replied by letter of June 11, 1952, reading in pertinent part as follows:
During the discussions held in this Office you advised that you would be in a position to start shipment of approximately 4,000 pounds monthly by August-September 1952, with a total quantity of 25,000 to 30,000 pounds by the end of the year, which you confirmed by letter dated May 28,1952. However, by letter dated May 29, 1952, you request that the contract be amended to ad- *409 vanee the original shipping date to the end of 1952 and to advance the schedule accordingly.
In view of your request that the letter of credit be renewed to cover the estimated deliveries during the last half of 1952, as set forth in your letter of May 28,1952, it will be necessary for you to clarify your request of May 29, 1952, to permit initial shipment of material to be made after December 31, 1952.
If you do not intend to make delivery before December 31, 1952, renewal of the credit for the last half of 1952 will serve no useful purpose. Please advise on. this point, since it is our understanding that shipments in the estimated quantities shown in your letter of May 28,1952 will be made before the end of the year.
(f) By registered letter of February 5,1953, the contracting officer advised plaintiff that unless deliveries were commenced before February 15,1953, plaintiff’s right to proceed would be terminated pursuant to Article 15 of the contract.
(g) On February 17, 1953, the contracting officer notified plaintiff in writing that, since it had failed to make any deliveries under the EPS contract, its right to proceed with any further deliveries had been terminated pursuant to Article 15 of the contract, without prejudice to other rights which the Government might have as a result of plaintiff’s breach of contract.
51. It is plaintiff’s contention that the failure and refusal of the DMPA on April 15, 1952, to approve the contract granting a loan to plaintiff for the exploration of columbite on plaintiff’s land in British Guiana, unless plaintiff would agreed to cancel the EPS contract of August 3, 1951, constituted a breach by defendant of that contract to plaintiff’s damage in the amount of not less than 75 cents per pound for 2,400,000 pounds of columbite, or a total of $1,800,000.
52. At the time plaintiff’s contract with EPS was executed, Messrs. Willems and Wolfson estimated that at the specified unit prices, plaintiff would earn a profit of 75 cents per pound on the concentrates it delivered to the Government. However, the evidence shows that this estimate was largely a guess. There were geological reports which estimated the presence of large quantities of columbite in British Guiana, *410 but no part of the area included in plaintiff’s concessions had been explored and information was lacking with respect to the particular locations in which columbite existed in quantities necessary to justify production. Neither plaintiff nor any other concern had had any experience in mining columbite in British Guiana. Consequently, no data were available for making an accurate estimate of the cost of producing and delivering the concentrates. Furthermore, it was apparent that the areas in which columbite existed were inaccessible to deepwater navigation, and there were no roads over which supplies and equipment could be moved into such areas.
53. On August 4,1952, the Columbium Corporation made an application to the DMPA for a loan of $300,000 for the development and production of columbite-tantalite in British Guiana. The application stated that the corporation had been organized in July 1952 to acquire the assets of Wil-lems Industries, Inc., and was prepared to go into production of columbite concentrates on mining concessions in British Guiana. The application was signed by Djalma Wolf son, secretary-treasurer of the corporation, and the information submitted in the application showed that a number of the stockholders were the same individuals who had been stockholders of Willems Industries, Inc.
54. The DMPA did not make a loan to the Columbium Corporation, but during the latter part of 1952, the corporation initiated a program not previously undertaken in British Guiana, namely, an exploration project for locating areas in which columbite-tantalite could be found in sufficient quantities to justify mining of the minerals on a commercial basis. In the latter part of 1952, the only assets which Willems Industries, Inc., owned were its mineral concessions in British Guiana; these concessions reverted to the Crown sometime in 1952 because of plaintiff’s failure to comply with the terms and conditions of such concessions.
55. During the period from the latter part of 1952 to 1959, the Columbium Corporation explored an area comprising 20,000 acres of land in British Guiana. A portion of this *411 area was included within the mineral concessions formerly held by plaintiff. The work was done under the direction of M. W. Ditto, president of the Columbium Corporation and a competent mining engineer with many years of experience in mining operations in the United States and in other countries. The work proceeded slowly because of the limited amount of money available, the inaccessibility of the land where the minerals were found, the rugged nature of the terrain, and the difficulties encountered in determining the type of machinery and equipment that are best adapted for separating the concentrates from the sand and gravel in which they are found. The following is a summary of the results of the exploration:
(a) The columbite-tantalite concentrates in British Guiana are particularly good, because the predominating mineral is columbite rather than tantalite, and there is little or no contamination of iron, tin, or other metal impurities.
(b) In the explored areas, the mineral deposits vary from a few ounces per cubic yard to 15 pounds per cubic yard.
(c) Of the total of 20,000 acres that have been explored, 5,000 acres contain sufficient deposits of columbite-tantalite to justify commercial operations.
(d) It has been extremely difficult to remove the minerals, because they are found in sand and gravel formations underlying humus and overburden in densely forested areas. The mineral-bearing gravels vary in depth from 2 feet to 22 feet. It is not economically feasible to attempt mining except in the areas where the gravel containing the minerals is at least 3 feet deep and will yield at least 2 pounds of columbite per cubic yard of gravel.
(e) Of the 20,000 explored acres, the trees have been cut down on only 200 acres and in this section, the mineral-bearing gravel has been removed from not more than 40 acres. In order to make an accurate determination of the amount of columbite that can be recovered, it will be necessary to cross-section the mineral-bearing gravel on 100-foot centers and, in some areas, at shorter distances to calculate the yardage. Such measurements have not been made by the Columbium *412 Corporation, because of the great difficulty and expense involved in removing the heavy growth of timber and the gravel that lies below the humus and overburden in the forested areas.
On the basis of the work done thus far, the engineer in charge of the operations has estimated that 1,500 acres of the total area explored contain 3 pounds of columbite-tantalite per cubic yard of gravel, or 18,000,000 pounds of mineral. A small pilot mill, consisting primarily of hydraulic classifiers, has been put in operation and the results thus far have shown that approximately 80 percent of the ore concentrates can be separated or recovered from the other materials.
On the basis of the operations by the Columbium Corporation over a 6-year period, it has been estimated that the columbite can be produced from some areas in British Guiana at a cost of approximately 2V/z cents per pound on an assumed processing of 500,000 pounds of mineral-bearing material per working year of 300 days. Before columbite can be produced at such a cost, an expenditure of hundreds of thousands of dollars for the purchase of mining equipment will be required. In addition, it will be necessary to construct a railroad from deepwater navigation to a point 45 miles inland, and from that point it will be necessary to build a truck road 46 miles further into the mining area.
The Columbium Corporation has stockpiled the columbite it has produced; none of it has been sold or exported.
56. There is no evidence that anyone has ever produced columbite profitably in British Guiana. Although the record shows that there were areas within the concessions held by plaintiff in British Guiana prior to December 31, 1952, in which it would have been economically feasible to produce columbite-tantalite, the evidence as a whole is not sufficient to establish with reasonable accuracy the costs per pound plaintiff would have incurred in mining and delivering the material called for under its EPS contract.
Had the DMPA approved plaintiff’s loan application on or by April 15,1952, an expenditure of not less than $200,000 and a period of one year’s exploration (according to the *413 estimates of plaintiff and Kennametal, Inc.,) would have been required for exploring and locating the areas from which the minerals could be mined at a profit.
If plaintiff and Kennametal, Inc., had explored and located areas in British Guiana where mining operations would have been economically feasible, it would have been necessary for plaintiff to borrow a large sum of money for the purchase of mining equipment and for the construction of transportation facilities needed to make deliveries of the material.
There is no evidence as to the amount of the expenditure that would have been required for these purposes, nor of the extent to which such expense would have been reflected in the cost of producing and delivering the concentrates to the EPS.

Defendant's Counterclaim

57. Article 15 of the contract entered into between plaintiff and EPS on August 3,1951, provided as follows:
TERMINATION :
Without consideration of any other terms or conditions of the contract the Government may at its option, terminate the Contractor’s right to proceed under the contract if the Contractor has not commenced deliveries in accordance with the contract terms on or before February 15,1953.
Article 12, “General Conditions” of the same contract provided :
Force Majetjre. (a) Except as hereinafter provided in subparagraph (b) of this article, in the event the contractor refuses or fails to make deliveries of material conforming to the specifications as defined in the contract within the time specified or any extension thereof, or to perform faithfully any conditions of the contract, the Contracting Officer, without prejudice to other rights resulting from breach of the contract conditions, may, by written notice, terminate the right of the contractor to proceed with any or all remaining deliveries under the contract.
* * * * *
58. On May 28,1952, the Administrator of the DMPA issued a regulation providing for the purchase by the Govem *414 ment of 15,000,000 pounds of contained combined columbite-tantalum pentoxides. The regulation provided in pertinent part as follows:
SegtioN 1. Basis and purpose. The purpose of this regulation is to establish a guaranteed purchase program designed to encourage the expansion of the production of columbium-tantalum bearing ores and concentrates of both domestic and foreign origin. The program was authorized by the Defense Production Administration on January 1, 1952. Under the program the Government agrees to purchase a minimum of 15,000,000 pounds of contained combined pentoxide (Cb206 plus Ta2Os).
Sec. 2. Definitions, (a) “Administrator” means the Administrator of the Defense Materials Procurement Agency.
(b) “Program” means the terms and conditions under which the Administrator will purchase columbium-tan-talum bearing ores and concentrates.
(c) “Lot” means shipments of columbium-tantalum bearing ores and concentrates of not less than 2,000 pounds, dry weight.
(d) “Seller” means any individual or firm having title to columbium-tantalum bearing ores and concentrates.
Sec. 3. Duration of the program. The program shall terminate and be of no further force or effect as of the close of business on December 31, 1956: Provided, however, That the Administrator may terminate the program as of the date when the Government has purchased 15,000,000 pounds of contained combined pentoxides (Cb206 plus Ta206).
Sec. 4. Participation under the program. Any seller may offer for sale to the Government columbium-tan-talum bearing ores and concentrates of either domestic or foreign origin which meet the specifications provided in section 5 of this regulation by delivering and offering such material to the Government in accordance with the terms and conditions as set forth in this regulation, at any time prior to the termination of the program.
Sec. 5. Specifications and price. The Government shall pay the following price for columbium-tantalum bearing ores and concentrates meeting the following specifications, determined on a dry weight basis:
(a) For columbium ores and concentrates containing not less than 35 percent combined Cb206 and Ta2Os and *415 having a Cb20? and Ta205 ratio of not less than one to one; impurities not to exceed the following maximum limits:

Percent

TiOa_ 8
SnOa_ 8
FeO_25
MnO_13
$1.40 per pound of combined contained pentoxide, plus 2 cents per pound for each additional full percent of combined contained pentoxide above 35 percent.
*
(e) Bonus. For lots meeting the above specifications, an incentive bonus amounting to 100 percent of the price specified in paragraphs (a), (b) and .(c) of this section will be paid on aU accepted deliveries, except that no bonus shall be paid on any lot previously owned by the Government.
59. The above-quoted regulation was issued by the DMPA pursuant to the authority vested in it by Executive Order 10281 (16 F.R. 789), which was promulgated pursuant to the provisions of the Defense Production Act of 1950 (64 Stat. 798).
During the loan negotiations among plaintiff, Kenna-metal, Inc., and the DMPA, Mr. McClintock of DMPA stated on several occasions, and particularly on March 7, 1952 (finding 36), that such a regulation was being prepared and would be issued in a short time.
60. As shown above, the DMPA purchase program was to terminate on December 31, 1956, but on October 9, 1953, the regulation was amended to provide that the program as it applied to ores and concentrates of foreign origin would terminate on December 31, 1956, and that as it applied to ores and concentrates of domestic origin, it would terminate on December 31, 1958 (18 F.R,. 6565).
The Domestic Minerals Program Extension Act of 1953 (67 Stat. 417), provided that the agency responsible for the purchase of columbium-tantalum-bearing ores or concentrates should publish at the end of each calendar quarter the amount of ores purchased in that quarter and the total amounts which had been purchased under the program.
*416 61. The schedule published in 20 Federal Eegister, pages 8767, 8768, on November 29, 1955, showed the purchases under the Defense Production Act of 1950, as of September 30,1955, as follows:

The schedule published on May 9,1959, in 24 Federal Eegister, page 3773, showed the final results of the purchases under the program as follows:

62. By letters of August 10, 1955, and January 4, 1956, from the Office of the Comptroller of GSA, plaintiff was requested to forward a check to the GSA in the amount of $976,000; the letters stated that since plaintiff had failed to deliver any of the concentrates required under its contract of August 3,1951, to the EPS, plaintiff was liable for damages under paragraph 12 of the “General Conditions” of the contract in the amount claimed.
The claim was computed by employees of the Comptroller’s office, who applied the unit prices specified in the EPS contract to the 2,400,000 pounds of material to be delivered *417 under that contract to arrive at a total contract price of $3,776,000. A computation was then made of what was designated as “the replacement cost” of such materials. Since the specifications for the material to be supplied under the contract differed from those set forth in section 5 of the DMPA regulation, the defendant’s employees took 55 percent of the contract quantities and multiplied the resulting figure by the base price plus the 100 percent bonus provided in the DMPA purchase program. The following table shows the results of this calculation:

63. The evidence does not establish that the defendant sustained damages in the amount of $976,000 as a result of plaintiff’s failure to deliver the 2,400,000 pounds of concentrates under the EPS contract for the following reasons:
(a) Plaintiff’s contract of August 3, 1951, was executed by the Emergency Procurement Service pursuant to the authority contained in the Strategic and Critical Materials Stock Piling Act of 1946 (60 Stat. 596) and in accordance with a Munitions Board Procurement Directive of December 14,1950. There is no evidence as to how much columbite the EPS purchased pursuant to the directive and the Stock Piling Act, nor whether the EPS was able to procure the concentrates plaintiff failed to deliver from other sources at prices that did not exceed the contract prices.
(b) As previously stated, the DMPA purchase program was inaugurated pursuant to the authority conferred by the Defense Production Act of 1950 and Executive Order No. 10281. The evidence does not establish that the DMPA *418 regulation and the prices paid for concentrates purchased pursuant thereto resulted from the failure or inability of the defendant to procure the concentrates pursuant to the Strategic Materials and Stock Piling Act of 1946 at the prices specified in plaintiff’s contract.
(c) There is no evidence that the base prices and/or the bonus provided for in the DMPA regulation of May 28, 1952, represented the market prices for such materials. The only evidence in the record is to the contrary. On March 7, 1952, when Mr. McClintock was discussing the proposed DMPA purchase program with representatives of plaintiff and Kennametal, Inc., he stated that while he was not at liberty to divulge the base prices to be paid under the proposed regulation, he believed that the base price would be substantially higher than the prevailing market price for the concentrates (finding 36). As shown in finding 58 above, section 5 of the DMPA regulation contained a schedule of base prices and also provided for an incentive bonus of 100 percent of such base prices.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed.
The court further concludes that defendant is not entitled to recover and, accordingly, its counterclaim is dismissed.