ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| 4H Construction Corporation | ) | ASBCA Nos. 59977, 60000 |
| | ) | |
| Under Contract No. W9127S-12-D-0026 | ) | |

APPEARANCE FOR THE APPELLANT:      S. Leo Arnold, Esq.
Ashley, Ashley & Arnold
Dyersburg, TN

APPEARANCES FOR THE GOVERNMENT:      Michael P. Goodman, Esq.
Engineer Chief Trial Attorney
S. DeAnn Lehigh, Esq.
Engineer Trial Attorney
U.S. Army Engineer District, Little Rock

OPINION BY ADMINISTRATIVE JUDGE KINNER

Appellant, 4H Construction Corporation (4H), appeals the Army's refusal to pay the costs it incurred preparing to perform a stand-by dredging contract on the Arkansas River. The Army terminated the contract for convenience prior to issuing a notice to proceed. Based upon the absence of that notice, the Army reduced its termination settlement offer and unilaterally determined 4H was entitled to no more than $58,500. A hearing of these appeals was held May 16-20, 2016.

FINDINGS OF FACT

4H bid on the Arkansas River dredging contract three times (tr. 2/59). The winning bid for the first solicitation was from a company that exceeded the small business limitation of the solicitation (*id.*). As the second low bidder, 4H submitted a protest, which was upheld (*id.*). Rather than award to 4H, the Corps of Engineers, Little Rock District, Little Rock, Arkansas, cancelled the solicitation (*id.*). The Corps resolicited the work without a small business set aside (tr. 2/60). 4H won the second competition (*id.*). A subsequent protest lead to the same result, a termination for convenience, which is the subject of this appeal, and a third solicitation (tr. 3/64). 4H was again awarded the contract from the third solicitation (tr. 2/64). 4H successfully completed the first year of that contract and was performing an option year at the time of the hearing (*id.*).

The solicitation contained instructions pertaining to ordering procedures and issuance of task orders (app. supp. R4, tab 3 at 35). Under the heading "Award

Information," the bidders were informed "[t]he Contractor is authorized to only perform the line items provided for and funded by the individual task order" (id.). Further, "[a]ll work under this contract will be ordered by issuance of Task Orders. A task order (written notification) utilizing [standard form (SF)] 1155 will be provided to the contractor within 30 calendar days prior to the initial date of service." (Id.) 4H understood these instructions to authorize it to incur costs upon issuance of a task order (tr. 1/110). However, section 11 on the award SF 1442, and clause FAR 52.211-10 also instructed the contractor to commence work within ten calendar days of receiving the notice to proceed (app. supp. R4, tab 3 at 21, 60). The contracting officer's technical representative (COTR) understood that it is the notice to proceed that authorizes the contractor to perform any task related to the work of the contract, including getting ready to move the dredge and preparing the dredge for moving (tr. 3/132). It was the COTR's understanding that the contractor is not paid pursuant to the mobilization line item in the statement of work until its dredge is on site and ready to commence dredging (tr. 3/152).

Bid opening for the second solicitation was September 24, 2012 (tr. 2/65; R4, tab 2). 4H received notice it was the low bidder and the contract award four days later, September 28, 2012 (tr. 2/67). On the day of the award and the following day, 4H received four task orders pursuant to the contract (tr. 2/68; R4, tabs 4-7). The Corps also sent 4H the documents it was required to complete prior to construction (tr. 2/69; app. supp. R4, tab 9). The Corps did not have sites that required dredging when the contract was awarded (tr. 3/135). The task orders, also referred to as delivery orders, instructed 4H that "[u]pon receipt of Notice to Proceed for this Delivery Order, the Contractor shall mobilize to [nautical mile] 44 (Mobilization Point)" of the Arkansas River (R4, tab 3 at 6). 4H never received a notice to proceed for any delivery order (tr. 2/118).

To prepare to mobilize for contract performance, 4H had to perform numerous tasks. It was necessary for 4H to repair the dredge to be used. (Tr. 2/189, 199) The 4H dredge superintendent testified that repairs that are required due to dredging on one job are not performed until required for the next dredging job (tr. 2/196). Dredging equipment requires repair after every job because the dredge runs all day every day (tr. 2/206, 208). 4H also needed to rig its equipment for towing to move its dredge from Houma, Louisiana, to the White River, Arkansas (tr. 2/183). Mr. Jim Harris, vice president of 4H, estimated the trip was 600 miles which could require at least 10 days depending upon weather and water conditions (tr. 2/182). Once reaching the Mississippi River, 4H needed subcontractors that specialized in towing on that river (tr. 2/184). Mr. Harris testified that the decisions of such subcontractors concerning availability, schedule and towing progress are beyond the control of 4H. The uncertainty of the time necessary to reach the mobilization site required 4H to begin preparatory work as soon as possible. (Id.) Mr. Harris assumed 4H had to be ready to commence dredging when the notice to proceed is issued (tr. 2/185). Contrary to Mr. Harris's presumption, the Corps did not require 4H

2

to be at the mobilization point, much less ready to commence dredging, at a specific date (tr. 3/135, 146). There is no evidence that this interpretation was communicated to 4H.

Notice of Protest

On October 9, 2012, the initial contracting officer sent Ms. Stacie Harris, president of 4H, an email with the subject line "RE: AWARD DOCUMENTS FOR STATION DREDGING— W9127S-12-D-0026" (app. supp. R4, tab 9 at 113). The entire text of the email stated: "Ms. Harris-We have just received a protest on this contract and will require us to stop all actions until further notice" (*id.*). Ms. Harris testified that she did not consider the contracting officer's email to be a stop-work order (tr. 2/70-71).[1] She read the message to say the Corps would cease activity on the contract (tr. 2/119). Mr. Harris understood the message to say the Corps was suspending its efforts (tr. 2/177). Ms. Harris and Mr. Harris believe their assessment of the contracting officer's email is confirmed by a stop-work order they saw subsequently (tr. 2/71, 177). They both believed the email was not a stop-work order because there would be no uncertainty in a stop-work order (*id.*). Ms. Harris insisted the message could not apply to 4H because the contracting officer referred to "us" as the object to stop all actions (tr. 2/119). But Ms. Harris acknowledged that 4H was the only party undertaking activities because it was performing the contract (*id.*). Ms. Harris made a request to the contracting officer for a copy of the protest (tr. 2/71). The contracting officer responded that she needed to check with her counsel before providing a copy of the protest to 4h (tr. 2/71). Ms. Harris never received a copy of the protest (tr. 2/72). There is no evidence in the record there were any further attempts to communicate with 4H until the termination notice.

---

[1] FAR 52.233-3, PROTEST AFTER AWARD (AUG 1996), was incorporated in the contract by reference (R4, tab 2 at 17). In part, the clause provides:

> (a) Upon receipt of a notice of protest (as defined in FAR 33.101) or a determination that a protest is likely (see FAR 33.102(d)), the Contracting Officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by this contract. The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage.

3

### Termination for Convenience and Audit

On November 19, 2012, Ms. Harris received from the contracting officer the termination for convenience of the contract (tr. 2/72-73; R4, tab 9). The Corps had failed to include a termination for convenience clause in the contract (tr. 2/73). Approximately a week before the government issued the termination for convenience, the government unilaterally issued Modification No. 1 incorporating FAR 52.249-2, Termination for Convenience of the Government, Alternate I, into the contract (tr. 1/110-11, 2/73; R4, tab 8 at 10, tab 9). Although this modification was not supplied to 4H (tr. 1/110, 2/73), the contracting officer and other government officials had discussed terminating 4H's contract beginning October 25, 2012 (tr. 1/112; app. supp. R4, tab 11).

4H's termination for convenience settlement proposal was assembled by William Frank Connole, a professional engineer who was qualified as an expert in damages and quantum calculations for government contracts (tr. 1/27, 48; R4, tab 13). He filled in half of the SF 1436 required for submission of a proposal (tr. 1/53). Mr. Connole described the direct cost lines of the SF 1436 he completed and the backup detailed transaction reports supporting the amounts he filled in (tr. 1/54; R4 tab 13 at 9-15). He testified that the amount of settlement expenses reflected actual incurred cost (tr. 1/63). The proposed settlement, including cost: $514,877; profit: $51,488; and settlement expenses: $65,000, totaled $631,365 (tr. 1/61-62; R4 tab 13).

4H was diligent in recording its expenses (tr. 2/97-98). Mr. Connole used his professional judgment to determine the amounts entered and how each was classified, as a direct or indirect cost (tr. 1/174). He then passed the form to 4H's accountant, Mr. Belote (tr. 1/53). R. Keith Belote was accepted as an expert in accounting for construction companies (tr. 2/5, 13). He testified to the integrity of 4H's accounting system (tr. 2/24; app. supp. R4, tab 85 at 2). He opined that 4H's books and records are reliable for audit and maintained according to Generally Accepted Accounting Principles (tr. 2/24).

The New Orleans Branch office of the Defense Contract Audit Agency (DCAA) audited the 4H settlement proposal (tr. 3/7). The DCAA supervisor, Mr. Dennis Barrois, and two auditors visited 4H's office for the DCAA audit (tr. 1/66, 3/33). Although one of the auditors during this visit was identified as a certified fraud auditor, Mr. Barrois testified that there was no indication of fraud (tr. 1/67, 3/8).

It was Mr. Barrois's expectation that the auditors would review samples from the documentation (tr. 3/34). Mr. Connole believes DCAA over sampled 4H costs, examining 78 percent of the costs (tr. 1/68, 2/80, 4/14; app. supp. R4, tab 81 at 1287). Mr. Barrois testified that DCAA asked for all transaction documentation in the first meeting with Ms. Harris (tr. 3/34). DCAA made two field visits to 4H offices, spending six days there, which Mr. Barrois did not consider unusual (tr. 1/68-9, 3/36). He mistakenly understood some of the information requested by DCAA to be missing

4

when DCAA came to the first meeting (tr. 3/37-38). Mr. Connole demonstrated that Ms. Harris had provided the universe of requested information by April 29, 2014, by showing that fact was recorded in DCAA's work papers (tr. 4/13; app. supp. R4, tab 81 at 1286). Mr. Barrois was similarly mistaken that 4H did not have all the requested documentation at the second meeting (tr. 3/36). DCAA did not need a second meeting to collect information requested before the initial meeting. The second meeting was necessitated by additional requests from DCAA. (Tr. 2/87, 4/15)

In its subsequent visit, DCAA again asserted 4H had not gathered all the information it had requested and gave the company a deadline to furnish the missing information (tr. 3/38-39). DCAA disregarded the information 4H provided after the deadline to support credit card charges for the oral leases of two boats (tr. 1/75, 2/49, 3/38, 4/17; app. supp. R4, tab 85 at 1719). Mr. Connole thought DCAA's refusal to consider documentation after the deadline would make the audit incomplete (tr. 1/70, 2/79,82-87). Nonetheless, based upon Mr. Connole's agreement with some of the DCAA rejected costs, 4H revised the expenses proposed to $446,221, adding in amortization for the time the company owned some of its boats (tr. 1/81; app. supp. R4, tab 50). According to Mr. Connole, during the time between the proposal and the audit report the settlement expenses went up to $130,530 due to 4H's efforts to work with DCAA (tr. 1/83; app. supp. R4, tab 50 at 292). Mr. Belote also agreed with some of DCAA's exceptions, such as the motorcycle and pontoons held by 4H were not properly capitalized in its accounting records (tr. 2/33). The DCAA audit verified the general and administrative costs (G&A), home office rates, indirect rate, and labor (R4, tab 21). Overall, DCAA questioned $227,161 of the $514,877 total costs proposed by 4H, leaving a total of $287,650 (id. at 3; tr. 1/87, 3/15). It did not question that the remaining amount proposed reflected incurred cost for this contract (id.). Nor did DCAA address profit (id.). The DCAA report verified $106,000 of 4H's settlement expenses claimed through June 2014 (tr. 1/137; app. supp. R4, tab 82 at 1578). Although DCAA verified most of 4H's costs, Mr. Connole identified major issues with DCAA's conclusions in a letter sent by email (app. supp. R4, tab 48). DCAA refused to consider 4H's objections to the audit report (tr. 1/89). DCAA's response to 4H's objections was reflected in the final audit report, which attached, but ignored 4H's letter (tr. 1/92).

## Claimed Direct and Indirect Costs

Mr. Connole prepared an expert report in which he focused on areas of disagreement between the initial DCAA report findings and the 4H settlement proposal (tr. 1/131-32; app. supp. R4, tab 84). Mr. Belote agreed with Mr. Connole's criticisms of DCAA's report (tr. 2/28; app. supp. R4, tab 48). When preparing his report, Mr. Connole had the benefit of the audit and confirmation of 4H's payment of all settlement expenses, as well as the depositions conducted by the parties (tr. 1/120). He included a summary of the costs reclassified or disallowed by DCAA with which he agreed (tr. 1/121; R4, tab 84 at 1606).

5

His report, however, highlighted what he considered incorrect in the cost alignment or disallowance by DCAA (tr. 1/121; app. supp. R4, tab 84 at 1605). Mr. Connole's report specifically discusses the costs questioned by DCAA: equipment cost (app. supp. R4, tab 84 at 1608); travel and lodging expenses (at 1607); parts and repairs (at 1610); settlement expenses (at 1612). For example, according to Mr. Connole, 4H's costs included payment for a portion of a six-month lease for land to use as a staging yard when its dredging operation moved to the Arkansas River (tr. 1/122; app. supp. R4, tab 84 at 1607). Under parts and repair, DCAA questioned $24,000 of that cost, shifting $16,000 to indirect cost (tr. 1/129). Mr. Connole disagreed with that approach because shifting that cost was improper and the portion not moved to indirect was disallowed (id.). Mr. Connole concluded that the total direct cost was $248,155 (app. supp. R4, tab 84 at 1615). Indirect cost was determined by multiplication of the direct cost by the determined overhead rate (tr. 1/130). The G&A cost was similarly calculated by multiplication of the sum of direct and indirect cost by the determined rate (id.).

When initially formulating the 4H settlement proposal, Mr. Connole made a mathematical error calculating the indirect cost resulting in the erroneous amount of $60,000 (tr. 1/131). That amount was increased to $82,000 in the revised proposal when he was alerted to the error (id.). But the primary disagreement between Mr. Connole's indirect rate calculations and the initial DCAA findings was caused by DCAA shifting cost from direct to indirect (tr. 1/132; app. supp. R4, tab 84 at 1611). Mr. Connole used the lower G&A rate calculated by DCAA because the difference with the rate he calculated was minor and based on DCAA removing some unallowable costs (tr. 1/133). Mr. Connole added 10 percent profit, rather than the 8.85 percent determined by the contracting officer using the weighted guidelines (tr. 1/134). He believed 4H was likely to earn higher than that, and it made up for some of the costs excluded by DCAA (tr. 1/134-35).

Mr. Connole found the hourly rates used to determine the cost of consultants and lawyers in 4H's proposal reasonable based upon his comparison to the amount of hours used in the audit by DCAA and his experience with similar rates in arbitrations (tr. 1/136-37). DCAA accepted only $2,000 of the $22,000 proposed in-house cost (tr. 1/137). Mr. Connole testified that 4H continued to incur settlement expenses past July 2014, the latest point at which DCAA verified costs, but subsequent costs were not reviewed by DCAA (tr. 1/137). 4H personnel stopped collecting their time on settlement activities June 30, 2014, because it was too burdensome to continue (tr. 1/138). Mr. Connole cut off the time included in his report for the lawyers and himself at January 31, 2015, just prior to issuance of the contracting officer's final decision (tr. 1/139). He included with his report the government's estimate of 10 days for 4H to tow its dredge 600 miles from its home base in Houma, Louisiana, to the Arkansas River (tr. 1/152). That estimate was also reflected in the government estimate for mobilization on this contract (tr. 1/153). As reflected in his report summary, the total of all recoverable cost, expenses, and profit found by Mr. Connole was $654,093 (tr. 1/140; app. supp. R4, tab 84 at 1615).

6

The DCAA Integrity and Quality Assurance Directorate (IQAD) in Virginia conducted a review of the audit completed by the New Orleans Branch office (tr. 3/17; app. supp. R4, tab 79 at 454). The January 21, 2016 IQAD report concluded that the work papers from the initial audit did not support the opinion expressed in the initial audit report (tr. 3/18; app. supp. R4, tab 79 at 452). The report also concluded that the initial audit failed to provide the contracting officer with sufficient information for him to make an informed decision regarding the 4H settlement proposal (tr. 3/24; app. supp. R4, tab 79 at 459). IQAD found that the initial audit improperly assessed the settlement expenses and the allocability of direct costs (tr. 3/25; app. supp. R4, tab 79 at 455, 459). The branch office team considered costs to be indirect when documentation supported the relation of such costs to the terminated contract (tr. 3/20; app. supp. R4, tab 79 at 455). The costs accepted by the IQAD amounted to $409,209, $4,000 more than 4H's original proposal (tr. 1/103). IQAD agreed with Mr. Connole's position, finding the cost shifting in the initial audit to be improper (tr. 1/129; app. supp. R4, tab 79 at 455). Mr. Barrois disagreed with the conclusions of the IQAD, asserting that his team complied with DCAA auditing procedures (tr. 3/22-23). However, the DCAA Eastern Regional office concurred in the IQAD evaluation of the initial audit (tr. 3/26; app. supp. R4, tab 79 at 452).

## The Contracting Officer's Final Decision

Jonathan Sawrie, assumed contracting officer responsibility for this termination settlement when he became the Corps' Civil Works Branch Chief in December 2013 (tr. 3/50). He had not dealt with a termination for convenience in his prior position with the Medical Support Branch (*id.*). He did not discuss the contract with the original contracting officer (tr. 3/80-81). Mr. Sawrie understood from the audit that 4H could support the amounts in its settlement proposal, but he did not otherwise consider the results of the audit (tr. 3/73). He made no assessment of the actual fees and expenses incurred by 4H for settlement (tr. 3/107). His negotiation position was entirely based upon his business judgment (tr. 3/108). Mr. Sawrie testified he did not rely upon the notice of protest email because it was not clear (tr. 3/68, 100). Likewise, the DCAA audit did not assume the notice was a stop-work order (tr. 3/104; R4, tab 22 at 5).

On February 12, 2015, the contracting officer issued his final decision, reaffirming his earlier letter to 4H (R4, tab 27). That earlier letter was in response to 4H's initial proposal of $631,365, where the contracting officer determined 4H was entitled to $58,500 (*id.*). The decision included an explanation for that amount. First, the contract had continued for only 49 days, in which 4H incurred $41,342 of compensable G&A cost (*id.*). Those costs were specifically attributable to 4H overhead charges for the principal in charge, financial manager, and an administrative assistant (*id.*). The decision stated the contracting officer determined this amount using the DoD standard for Unified Facilities Criteria (UFC) which is established in the handbook for construction estimating, 3-740-05:11-2 (*id.*). Profit of $3,658 was

7

included according to the contracting officer's application of the weighted guidelines method from UFC (*id.*). And settlement expenses of $13,500, were allowed based upon Mr. Sawrie's business judgment, and his consideration of industry standards, past history of court cases, historic negotiated settlements, and The Equal Access to Justice Act (*id.*).

Contrary to the explanation in the decision, Mr. Sawrie's determination to award $58,500 was based on advice from a Corps estimator. The government estimate was premised upon the absence of a notice to proceed, precluding any direct costs. (Tr. 3/163-64, 166; R4, tab 22) The cost estimation was built upon rates extracted from 4H's proposal and various assumptions of the duration of the work in that proposal (tr. 3/155-58; R4, tab 22). Despite the government estimate, the contracting officer does not dispute that the costs claimed by 4H were incurred for its preparation to perform the contract or as allowable settlement costs (tr. 3/107). The contracting officer agrees that the amounts included in 4H's claim that were not questioned by DCAA reflect costs incurred by 4H in performance of the terminated portion of the contract (*id.*).

### DECISION

The contractor has the burden to show by a preponderance of the evidence that it is entitled to a settlement amount greater than that determined by the contracting officer. *Gen. Dynamics Land Sys., Inc.,* ASBCA No. 52283, 02–1 BCA ¶ 31,659 at 156,411. Although the burden is on the contractor to show entitlement to a larger settlement amount, the overall purpose of a termination for convenience settlement is to fairly compensate the contractor and to make the contractor whole for the costs incurred in connection with the terminated work. *SWR, Inc.,* ASBCA No. 56708, 15-1 BCA ¶ 35,832 at 175,223; *Freedom Elevator Corp.,* GSBCA No. 7259, 85-2 BCA ¶ 17,964 at 90,032. Fair compensation in a settlement agreement "is a matter of judgment and cannot be measured exactly." FAR 49.201(a) (2002); *Nicon, Inc. v. United States,* 331 F.3d 878, 885 (Fed. Cir. 2003); *Pro-Built Construction Firm,* ASBCA No. 59278, 17-1 BCA ¶ 36,774 at 179,197.

The Corps improperly rejected the documented costs 4H incurred for preparatory work. It incorrectly insists that the provisions of the contract restricting the contractor's commencement of work to its receipt of a notice to proceed establishes an absolute bar to recovery of costs incurred prior to that notice. (Gov't br. at 4-5; tr. 3/155) (The government's opinion is that there is no notice to proceed so there are no direct costs.). The Corps' position is incorrect because it misperceives the relation between the clauses governing commencement of work and termination for convenience. The term of the contract that governs the contractor's recovery following a termination for convenience is the termination for convenience clause, not

8

a clause defining the notice to proceed. *Rex Systems Inc.*, ASBCA No. 59624, 16-1 BCA ¶ 36,350 at 177,217.

The Corps, however, failed to include a termination for convenience clause when assembling this solicitation. On November 6, 2012, just prior to issuance of the termination for convenience, it added the Termination for Convenience clause, FAR 52.249-2 Alternate I to the contract by Modification No. 1.[2] That version of the clause does not explicitly state the contractor should recover costs incurred in preparatory efforts for contract performance. Nonetheless, 4H is entitled to compensation for any direct or indirect costs it reasonably incurred in preparing to perform the contract prior to the issuance of the notice to proceed, plus profit on those preparatory activities. *American Eagle Industries, Inc. v. Babbitt*, 215 F.3d 1344 (Fed. Cir. 1999) (table); *American Boys Construction Company*, ASBCA No. 60515, 17-1 BCA ¶ 36,856 at 179,589; *Pro-Built*, 17-1 BCA ¶ 36,774 at 179,197. Thus, the resolution of this appeal turns upon the reasonableness of the costs incurred by 4H in preparation to perform.

It is well established in the record that it was necessary for 4H to undertake preparatory activities for it to be prepared to mobilize for dredging on the Arkansas River once it received a notice to proceed. The uncontroverted testimony of Mr. Harris, and Mr. Ted McCoy, 4H's dredge superintendent, established that they understood it was necessary to reach the mobilization point set in the contract prior to the notice to proceed. No Corps official informed 4H personnel that there was no expectation of dredging work following the notice to proceed. It was not unreasonable for Mr. Harris to assume that 4H had to be ready to mobilize when the notice to proceed is issued. Thus, 4H personnel were concerned that it had to deliver its dredge and all necessary equipment from Houma, Louisiana, to the mobilization point on the White River, Arkansas. Mr. Harris estimated the trip to the mobilization point was 600 miles which could require at least 10 days depending upon weather and water conditions. Numerous tasks were necessary to prepare the dredge to be moved. 4H had to rig its equipment for towing. Before towing, it was necessary for 4H to repair the dredge that would be

---

[2] 4H argued that the Corps improperly selected a favorable termination clause, but the clause incorporated by Modification No. 1 would have been included in the contract by operation of law pursuant to the Christian Doctrine without that modification. *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963). 4H also argued that clause 252.236-7003 Payment for Mobilization and Preparatory Work, which would support payment of its preparatory expenses, appeared in the solicitation but was removed from the contract as awarded (app. reply br. at 3; app. supp. R4, tab 3 at 57). We need not address this given the fact the termination for convenience clause determines 4H's recovery of preparation costs.

9

used. Mr. McCoy testified that dredging equipment requires repair after every job because the dredge runs all day every day. The repairs that are required on one job are not performed until the dredge is required for the next dredging job. Corps officials did not challenge this testimony. We conclude 4H's actions were reasonable under these circumstances and 4H is entitled to reimbursement of any proven incurred preparatory costs.

Despite preparations by 4H for mobilization, eleven days after award the contracting officer sent an email to Ms. Harris saying: "We have just received a protest on this contract and will require us to stop all actions until further notice." Mr. Sawrie believed the contracting officer's email was intended to be a stop-work order pursuant to FAR 52.233-3. The contracting officer's email clearly explained the message was in response to a protest "on this contract" and that she thought all "actions" had to stop. Having received that email, 4H faced a risky course to continue its work. The contracting officer's email suggested the possibility that the costs 4H incurred following that email would not be reimbursed by the government. Contrary to Ms. Harris's testimony, and the testimony of Mr. Harris, the reference in the email to "us" was more likely a suggestion of coordination between the contracting parties. Ms. Harris understood 4H to be the only party performing contract activities (tr. 2/119). Ms. Harris made no further attempt to clarify the email after the contracting officer failed to provide a copy of the protest as she had requested (tr. 2/72).

The email was, however, unclear. Contrary to the directions in FAR 52.233-3, the email did not state that the stop-work order was issued pursuant to that clause. In its brief, the Corps concedes the contracting officer's effort at issuing a stop-work order was "flawed" and that it only raised the issue to prove (1) the appellant knew about the protest and (2) "[a]ppellant alleged interpretation of the notice in the email has bearing upon their overall credibility" (gov't br. at 12). Despite the contractor's request, the Corps failed during performance to confirm to the contractor that it intended to stop the work or provide a copy of the protest. Moreover, the termination contracting officer disregarded that notice. And DCAA did not consider the notice to have affected the costs incurred during its audit. At the hearing, there was no attempt by the government to establish what portion of the costs requested in 4H's settlement proposal were incurred following the contracting officer's notice of protest. In these circumstances, we conclude the email was not a valid stop-work order that would bar recovery of preparatory costs and it was reasonable for 4H to have incurred such costs.

Accordingly, the termination clause requires the contracting officer to pay the contractor for the cost of the contract work performed before the date of termination. FAR 52.249-2(g)(2)(i). It requires the contracting officer to pay the contractor profit on the work performed. FAR 52.249-2(g)(2)(iii). The clause also requires the contracting officer to pay the contractor the accounting, legal, clerical and other expenses reasonably

10

necessary for the preparation of the termination settlement proposal and supporting data. FAR 52.249-2(g)(3)(i).

## Quantum

4H supplied the underlying documentation to support the costs it claimed to DCAA and to the government in discovery (R4, tab 13; app. supp. R4, tabs 50, 78). In the initial audit, DCAA questioned those costs, redistributed direct charges to indirect costs, and disallowed other charges. DCAA's challenge to those costs was not supported by 4H's books and records. It was also discredited by the IQAD report, and appellant's expert reports. Furthermore, DCAA's conclusion in its audit was not supported in its report, in the IQAD report, or at the hearing.

Mr. Sawrie did not consider the IQAD report because it was issued after his decision (tr. 3/67). Rather, as termination contracting officer, Mr. Sawrie "stipulated" to all costs found by DCAA (tr. 3/107). Similarly, although the Corps questioned Ms. Harris's understanding of various less significant charges, the accumulated cost accounting upon which the settlement proposal is based otherwise went unchallenged (tr. 2/98-101). Thus, 4H has proven the amount of its costs and expenses requested in its revised proposal with reasonable certainty. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (quoting *Willems Indus., Inc. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961), *cert. denied*, 370 U.S. 903 (1962)). Accordingly, 4H recovers its claimed costs. DCAA's initial report was corrected by the IQAD quality control audit to conclude 4H should recover $409,209 in reimbursable costs. As discussed above, Mr. Connole's expert report documents further corrections of $26,172 to the other direct costs incurred, resulting in a total of $435,381 incurred cost. (App. supp. R4, tab 84 at 1607-11; tr. 1/121-29)

## Profit

The contracting officer is required to pay profit on the preparatory efforts by 4H prior to termination. The contracting officer's final decision states that an 8.85 percent rate for profit was determined based upon UFC 3-740-05 using the Weighted Guidelines Method. (R4, tab 27) The contracting officer was free to design the structured approach he used to determine profit. DFARS 215.404-4, Profit, (c)(2)(C)(1)(iv); 215.404-73(b). The contracting officer is required to document his profit analysis in the contract file. DFARS 215.404-4, Profit, (c)(2)(E). When using the Weighted Guidelines Method, the analysis is recorded using DD Form 1547. DFARS PGI 215.404-70. Here, the Corps provided no further support for its profit determination beyond the final decision, despite the contractor's requests. (Tr. 1/97; app. supp. R4, tabs 65, 67) DCAA did not address profit in its report (tr. 1/87). Nor did the IQAD report (tr. 1/103).

In its proposal, 4H sought 10 percent profit. To obtain the higher rate proposed, 4H had to prove by a preponderance of evidence that the rate selected by the contracting

11

officer is incorrect. 4H challenges the contracting officer's determined rate, with the expert opinion of Mr. Connole. Mr. Connole's opinion regarding profit is premised upon 4H's recovery of cash outlays for mobilization that were not recovered due to the termination. (Tr. 1/134; app. supp. R4, tab 84 at 1612) Those costs were documented in the amount of $108,151.32. Mr. Connole's calculations and reasoning were submitted unchallenged at the hearing. 4H has adduced a preponderance of the evidence to support its recovery of 10 percent profit equaling $43,538.

**Settlement Expenses**

4H should recover its accounting, legal, and other expenses reasonably necessary for the preparation of the termination settlement proposal and supporting data. FAR 52.249-2(g)(3)(i). DCAA had verified 4H's settlement expenses through June 2014. Mr. Connole's expert report documents 4H's settlement expenses through January 2015. His comparison of the professional expenses 4H incurred to the time expended by DCAA, and the rates he has experienced was unchallenged. 4H recovers the accumulated settlement expenses demonstrated in Mr. Connole's report of $175,174.

CONCLUSION

The appeal is sustained. 4H recovers $654,093 plus interest from May 6, 2015, the date of the certified claim.

Dated: April 17, 2019

DONALD E. KINNER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59977, 60000, Appeals of 4H Construction Corporation, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
